# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412

---

| | |
|---|---|
| Appellate Court Caption | GWEN KLINGELHOETS, Plaintiff-Appellee, v. STACIA CHARLTON-PERRIN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-2412 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | November 21, 2012<br><br>January 4, 2013<br>January 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A verdict of over $700,000 for plaintiff in an action for the injuries she suffered when she was struck by defendant's vehicle was upheld over contentions that the trial court made several errors and that a new trial was required, since, *inter alia*, plaintiff's "attacks" on defense counsel and defendant's medical expert did not warrant reversal, the trial court did not abuse its discretion in refusing to allow defendant to call an occurrence witness as a defense witness after plaintiff decided not to call her, the testimony of plaintiff's friend concerning plaintiff's "mental status" after the accident was not "unqualified subjective opinions," and allowing plaintiff to testify that she stopped therapy because of the cost was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-335; the Hon. Clare Elizabeth McWilliams, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Michael Resis, of SmithAmundsen LLC, of Chicago, for appellant.

Michael W. Rathsack, Timothy M. Richardson, and Elizabeth Spellman Pudenz, all of Chicago, for appellee.

Panel     JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Presiding Justice Lavin and Justice Epstein concurred in the judgment and opinion.

## OPINION

¶ 1     Plaintiff-appellee Gwen Klingelhoets (plaintiff) brought a negligence action against defendant-appellant Stacia Charlton-Perrin (defendant) arising from an automobile accident. Following a jury trial, the trial court entered judgment on the verdict in favor of plaintiff and against defendant in the amount of $713,601.82. Defendant now appeals, contending that the trial court erred in allowing plaintiff to make "repeated and unfair attacks" in opening statement and closing argument, in not permitting defendant to call a certain witness, in denying her motions to bar two other witnesses, and in allowing the jury to hear testimony that plaintiff did not continue with treatment because of its cost. She also contends that the jury's verdict was against the manifest weight of the evidence. Defendant asks that we reverse the judgment entered upon the jury verdict and remand with directions to grant a new trial or a remittitur. For the following reasons, we affirm.

¶ 2                     BACKGROUND

¶ 3     On October 25, 2006, defendant, who was trying to make a right turn in her sport utility vehicle (SUV) at an intersection from Northbrook Shopping Mall onto Lake-Cook Road in Northbrook, Illinois, struck plaintiff, who was walking across the street. Defendant admitted liability, but disputed plaintiff's injuries and damages, including her claim of future medical costs. Accordingly, the cause proceeded to a jury trial on these issues.

¶ 4     Before trial began, defendant filed three motions relevant to this appeal. The first was a motion to bar the testimony of one of plaintiff's medical expert witnesses, Dr. Robert Kohn. Plaintiff disclosed that she would be calling Dr. Kohn to rebut the testimony of defendant's medical expert, Dr. Richard Galbraith. Defendant objected, claiming that Dr. Kohn's testimony was not true rebuttal evidence but, instead, only cumulative opinions to those of plaintiff's other medical expert, Dr. Mary Jane Chaisson. After briefing, the trial court denied defendant's motion to bar Dr. Kohn.

¶ 5     The second relevant motion filed by defendant was a motion to quash the evidence depositions of Janet Dobbs and Rachel Yarrow. Plaintiff had taken these depositions before trial, as Dobbs and Yarrow, her coworkers, were present during the accident. However, after

defendant admitted liability, plaintiff decided she would not be calling Yarrow as a witness and would only be calling Dobbs, since only Dobbs had actually seen the accident and could testify regarding the nature of the impact. At this point, defendant withdrew her motion to quash before a ruling was entered and told the trial court that she might want to use Yarrow's deposition at trial. The trial court denied defendant's request to call Yarrow.

¶ 6        Defendant's third pretrial motion at issue was a motion to bar the testimony of Carol Heerema, plaintiff's coworker and friend, regarding plaintiff's mental status and processes when she saw plaintiff 10 days after the accident. Defendant claimed this constituted medical opinion testimony from a lay witness and, thus, lacked an adequate foundation and was improper. Following argument, the trial court denied defendant's motion and ruled that Heerema could testify as to what she observed about plaintiff after the accident.

¶ 7        The cause then proceeded to trial. Plaintiff testified that she lives in Minnesota and was in Northbrook, Illinois, on business as a sales representative for a medical company specializing in neurological rehabilitation products. She was 47 years old at the time of the accident and was the company's most productive salesperson; she was also very active in social and sporting activities with her husband. With respect to the accident, plaintiff averred that she was walking with several coworkers to attend a dinner at a restaurant when she entered a crosswalk on a green light and was struck by defendant's SUV. She did not remember the impact or whether she lost consciousness, only that she was lying on the pavement on her back and had pain in her head, neck, shoulder and leg. She declined treatment from paramedics at the scene and attended the dinner with her coworkers. However, after a short time at the restaurant, she began to feel ill and she returned to her hotel, where she vomited. Dobbs then took her to the emergency room.

¶ 8        Plaintiff further testified that she flew back to Minnesota the day after the accident and stayed home from work for a few days, without improvement. She suffered from severe headaches and became sensitive to light and sound. She would get lost, lose her balance and was unable to sleep. She went to her family doctor, to a chiropractor, and then to Dr. Chaisson in December 2006, who also referred her to a physical therapist. She returned to work, but noticed that she was performing slowly and needed to relearn things she knew well. Her memory and concentration worsened and she became unable to perform her job functions. She eventually had to change jobs and now works as an occupational therapist. She currently still sees Dr. Chaisson and a physical therapist, but she is in pain on a daily basis and cannot perform her activities to the same level she did before the accident.

¶ 9        Dobbs testified that she is plaintiff's coworker, is a specialist in training neurologically impaired patients, and was walking with plaintiff and some 10 to 15 other coworkers to attend a dinner at the time of the accident. As Dobbs was about to enter the crosswalk, she heard an automobile gun its engine. She then looked up and saw defendant in her SUV and on her cell phone, trying to turn into the intersection; plaintiff was already in the crosswalk several steps ahead of Dobbs. Dobbs saw defendant hit plaintiff, who folded over the front of the SUV and was thrown back about 10 feet, landing sitting up outside the crosswalk with her legs extended out but then falling backwards and hitting the back of her head on the pavement. Defendant exited her SUV and approached the scene, but then walked away, all the while talking on her cell phone. Dobbs further testified that plaintiff had cuts on her

forehead and a bruise on her leg but had not lost consciousness. She confirmed that plaintiff denied treatment at the scene and instead went to the restaurant with her coworkers. Soon thereafter, she became shaky and Dobbs accompanied her to the emergency room. After plaintiff was discharged, hospital staff asked Dobbs to stay with her, telling Dobbs that plaintiff had a head injury and needed to be monitored.

¶ 10    Dr. Scott Cooper testified that he treated plaintiff when she arrived at the emergency room. Plaintiff had been hit by an SUV on her left side and had struck her head on the car. She had a contusion on her forehead, and she complained of headaches and had vomited. Dr. Cooper noted that plaintiff did not report a loss of consciousness and was, at the time, alert, calm and oriented with no cognitive difficulties. A CT scan of her head was normal, and he did not see any neurological problems at that time. Dr. Cooper diagnosed plaintiff with having sustained a head injury and exhibiting symptoms akin to having suffered a mild concussion, in addition to injuries to her neck, shoulder and leg.

¶ 11    Mark Klingelhoets, plaintiff's husband, testified that, before the accident, plaintiff was a happy and active person, participating in various sports and outdoor activities, including hiking, biking and skiing. After the accident, however, plaintiff suffered from memory problems and her reaction to things seemed delayed. She gets very frustrated, cannot make decisions and sleeps a lot. While she still works full-time and participates in certain activities, he described her as "lost" and constantly requiring pain medication before performing any activities.

¶ 12    Carol Heerema, an occupational therapist, coworker and friend of plaintiff's for 25 years, testified that, before the accident, she knew plaintiff to be a high-functioning, intelligent and confident person; plaintiff often gave lectures as part of her job which Heerema attended. Heerema saw plaintiff some 10 days after the accident at a business conference and observed that she seemed confused, was having trouble mentally and was just not "acting like herself." For example, plaintiff could not remember Heerema's name and Heerema had to help her navigate her way around the conference because plaintiff could not follow a map. Heerema averred that she "had never seen [plaintiff] act that way before." Some time later, after plaintiff had changed jobs, Heerema saw her again, several times. During their visits, Heerema noted that plaintiff was slower to respond, made mistakes, had difficulty with her memory and lacked confidence. She testified that plaintiff "just wasn't the same person anymore."

¶ 13    Defendant testified that, at the time of the accident, she was exiting the mall and was attempting to turn right after having stopped at a signal. It was dark, and she looked to the right and left of her. Just as she took her foot off the brake and began to accelerate, she hit plaintiff with her SUV while plaintiff was crossing the street. Defendant denied being on her cell phone at the time of the accident, but averred that she never saw plaintiff or any of her 15 coworkers before hitting her. She further testified that she did not see the actual impact or whether plaintiff hit her head or was thrown. She stated that she called 911 and her boyfriend and exited her vehicle, finding plaintiff sitting up on the pavement in the crosswalk directly in front of her car.

¶ 14    The medical evidence presented at trial was lengthy. Dr. Chaisson, plaintiff's treating

neurologist, testified that she began seeing plaintiff in December 2006 upon referral. She reviewed all of plaintiff's medical records, including her emergency room visit, her primary care records and her chiropractic records. Plaintiff presented with symptoms associated with head injury, including nausea, neck pain, light and sound sensitivity, and daily headaches; she had a "hard time" recounting the accident. Upon an initial neurological examination, Dr. Chaisson found that plaintiff had obvious neurologic deficits, including memory issues and clumsiness, along with eye pain and difficulty sleeping; this concerned her, particularly because the accident had occurred two months earlier. In addition to her suspicions regarding bad cervical whiplash and internal disc derangement, she diagnosed plaintiff with a closed head injury, prescribed her medication, and referred her to a physical therapist.

¶ 15    Dr. Chaisson saw plaintiff again in January 2007. She still had multiple headaches and described a decreased ability to think. Dr. Chaisson performed an examination and found that, while plaintiff was calm and orientated, she still had a lot of pain, especially in her neck and head, and showed a sensitivity to light and sound, as well as frustration and trouble concentrating. She noted that plaintiff had to change jobs because of her pain. An MRI showed abnormalities in her cervical discs. During follow-up visits through 2007, plaintiff continued to complain about headaches and pain, particularly in her neck. She was unable to perform certain activities she had done before the accident and had persistent problems with memory and concentration; she was in pain on a daily basis. By 2008, plaintiff still had the same complaints and had adopted "a new lower level of function"; in addition to the headaches and decreased memory and concentration, she had fatigue, decreased endurance, intermittent numbness and still experienced sensitivity to light and sound. The results of a neuropsychological exam were technically within normal range, but below expectation for plaintiff, suggesting abnormality. Dr. Chaisson stated that all these persistent symptoms were consistent with a closed head injury.

¶ 16    Dr. Chaisson further testified that plaintiff will continue to have daily pain, which she will have to find some way to manage. She will permanently have problems with short-term memory and concentration. She will also continue to experience numbness, neck pain and difficulty sleeping, and currently has depression and takes various medications. Dr. Chaisson stated that these symptoms are "not expected to get better" and are "going to be more of a problem over time." Ultimately, Dr. Chaisson diagnosed plaintiff with a "concussive type blow to her head which has resulted in a closed head injury" directly caused by the accident, and that her injury is "permanent" and "unlikely to get any better at this point." Dr. Chaisson also stated that plaintiff will require future medical care "just to maintain her at a relatively comfortable level," and detailed this, as well as its costs, for the jury.

¶ 17    Briefly, physical therapist Mark Bookhout testified that he treated plaintiff on referral from Dr. Chaisson in January 2007. She presented with neck pain and headaches and, while her X-rays and CT scan were negative, he diagnosed her with a significant whiplash injury. Plaintiff continued with therapy through December 2008 and improved; however, she still had the same medical problems with which she began treatment. Plaintiff returned to Bookhout in September 2009, as referred by Dr. Chaisson, and completed treatment in December 2009 with some improvement. Bookhout further testified that plaintiff's head and neck pain were caused by the accident, that her condition was permanent and that she would

require future treatment.

¶ 18    Dr. Kohn, a board-certified neurologist and plaintiff's retained medical expert witness, testified that he examined plaintiff both physically and mentally and took a detailed history, examining her medical records and radiological films. Based on all this, Dr. Kohn opined that plaintiff had suffered a mild traumatic brain injury, a concussion and major depressive disorder secondary to such an injury. He also ordered a brain imaging study called a SPECT, a special test that, though not definitive, provides an objective study and with which he was very familiar. The result of plaintiff's SPECT was consistent with the trauma she suffered in the accident where she hit her head. Her neuropsychology testing was also abnormal, suggesting problems with certain brain areas consistent with this trauma. Dr. Kohn noted that all of her symptoms after the accident were akin to those of a mild traumatic brain injury and postconcussion syndrome, with which he ultimately diagnosed her. He stated that plaintiff's injuries were permanent, including the limited range of motion in her neck, her cognitive and emotional difficulties, and her headaches and neck pain; she also had torn cervical ligaments and depression. Dr. Kohn further testified that plaintiff would require future medical care and treatment, and he detailed this for the jury.

¶ 19    Dr. Galbraith, defendant's retained medical expert witness, testified that he has been a board-certified neurologist for some 45 years and has worked at the Mayo Clinic, has had dozens of staff appointments at different hospitals, was a clinical professor and has published several articles. Currently, he does not treat patients, but does only "medicolegal consulting" work on legal cases. He classified himself as an independent contractor who works for several legal consulting companies and averred that 99% of his work is for the defense. He also described that he is paid for his consultation work and expert testimony, and he discussed his rates for the jury.

¶ 20    Regarding plaintiff, he testified that he saw her twice and had read Dr. Kohn's report. He was in agreement that plaintiff had hit her head on the hood of the SUV, but disagreed that she had hit her head on the pavement. He opined that plaintiff had a head trauma but had not suffered a head injury. When he first saw her in 2007, he believed she suffered from cervical neck strain, shoulder strain and headaches, but did not consider any of these to be permanent injuries. He then saw her again in 2008 at which time he deciphered notes from an MRI to be normal. While he noted that she was still suffering from neck pain and headaches, he considered her balance to be normal and did not think she had light sensitivity because she was not wearing sunglasses. He opined that Dr. Chaisson's records indicated plaintiff was fine and her neuropsychological tests were within normal range. He refuted any diagnosis that plaintiff had suffered a closed head injury, a traumatic brain injury or even a concussion from the accident. He further testified that plaintiff has reached her maximum level of improvement and was not in need of any future medical care, as there was no evidence of permanent injury of any kind.

¶ 21    On cross-examination, Dr. Galbraith admitted that all of his income derives from hired witness work but stated that, while some would classify this negatively, he was "not a hired gun." He also admitted that he did not know what a SPECT test was until he reviewed plaintiff's case. He averred that he only reviewed written reports regarding plaintiff and her treatment and never once reviewed any of the actual films of her radiological examinations,

such as her CT scans or MRIs. He agreed that plaintiff had no prior history of headaches, dizziness or depression, and that these were caused by the accident; he also agreed that the neuropsychological tests showed that plaintiff had some minimal impairment. Yet, he then reaffirmed his opinion that plaintiff had not suffered a head or brain injury from the accident, and stated that factors including how fast the SUV was traveling when it hit plaintiff and questions such as whether she was thrown in the air, hit her head on the pavement or landed on someone else were all irrelevant to his conclusions because he was focused solely on the end result of this case which, in his opinion, was that plaintiff was fine.

¶ 22    At the close of trial, the jury returned a verdict in favor of plaintiff and against defendant in the amount of $713,601.82. The jury itemized the verdict to include awards for loss of normal life experienced, future loss of normal life experienced, pain and suffering, future pain and suffering, reasonable expenses of necessary medical care received in the past, present cash value of reasonable expenses of medical care reasonably certain to be received in the future, and lost earnings. The trial court entered judgment on the verdict. Defendant filed a motion for a new trial or remittitur; the trial court denied the motion.

¶ 23                                        ANALYSIS

¶ 24    Defendant raises two principle issues on appeal. In the first, she contends that the trial court made five errors that, alone or in combination, deprived her of a fair trial. In the second, she contends that the jury's verdict and the trial court's judgment entered thereon are contrary to the manifest weight of the evidence and should be vacated for a new trial or a remittitur. We address each separately.

¶ 25                              I. Fair Trial Concerns

¶ 26    As noted, defendant claims that her motion for a new trial should have been granted due to several errors committed by the trial court which deprived her of her right to a fair trial. Essentially, defendant is asking us to set aside the jury verdict. A reviewing court will set aside a jury verdict only if it is against the manifest weight of the evidence, that is, only if the jury's findings are unreasonable, arbitrary and not based on the evidence presented, or if the opposite conclusion is clearly apparent. See *Barth v. State Farm Fire & Casualty Co.*, 371 Ill. App. 3d 498, 509 (2007) (standard of review in challenging jury verdict is that verdict is not disturbed unless contrary to manifest weight of evidence). In addition, whether a trial court erred in denying a motion for a new trial, which defendant insists occurred here, is reviewed under an abuse of discretion standard. See *Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.*, 342 Ill. App. 3d 150, 157 (2003).

¶ 27              A. Plaintiff's Opening Statement and Closing Argument

¶ 28    The first error defendant asserts is that she was denied a fair trial when the trial court allowed plaintiff to make "repeated and unfair attacks" on Dr. Galbraith and defense counsel during opening statement and closing argument. She isolates two quotes from plaintiff's opening statement wherein plaintiff commented that Dr. Galbraith was "a hired witness" and

has "made a career out of" this. She then quotes portions of plaintiff's closing argument wherein plaintiff called the legal companies for which Dr. Galbraith works "a factory or an assembly line of defense opinions and defense reports" and commented generally on Dr. Galbraith's compensation, along with a statement that defense counsel "just doesn't like the evidence" and was "talking out of both sides of their mouth" while Dr. Galbraith has been "riding that defense train" for the last several years. Defendant claims that these were "blatantly argumentative" and "inflammatory" remarks that were "unreasonable and highly prejudicial," thereby meriting reversal as a matter of right. We disagree.

¶ 29    Opening statements are meant to apprise the jury of what the parties intend to prove at trial. See *People v. Phillips*, 392 Ill. App. 3d 243, 268 (2009). While no comment should be made therein that counsel will not or cannot prove, opening statement may include a discussion of expected evidence and reasonable inferences to be drawn therefrom. See *Phillips*, 392 Ill. App. 3d at 268. Reversal based on improper comments during opening statement will occur only when the comments are made deliberately via misconduct and result in substantial prejudice to the opposing party such that the result of the trial would have been different had the comments not been made. See *Phillips*, 392 Ill. App. 3d at 268 (discretion as to propriety of comments lies with trial court and every presumption is made that discretion was exercised). Similarly, the standard of review in the examination of specific remarks made during closing arguments is whether the remarks were of such character as to have prevented the opposing party from receiving a fair trial. See *Lewis v. Cotton Belt Route–St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 119 (1991) (citing *Trice v. Illinois Central Gulf R.R. Co.*, 127 Ill. App. 3d 1019, 1022 (1984)). It is well established that a party is afforded broad latitude in making her closing argument. See *Weisman v. Schiller, Ducanto & Fleck, Ltd.*, 368 Ill. App. 3d 41, 62 (2006); accord *Lewis*, 217 Ill. App. 3d at 119 (citing *American National Bank & Trust Co. of Chicago v. Thompson*, 158 Ill. App. 3d 478, 487 (1987)). While it is improper to make personal opinions of and unjustified attacks on the opposing party which are unsupported by evidence of record, it is not improper to comment during closing argument on the opposing party's credibility or judgment when those remarks are based on facts in evidence. See *Lewis*, 217 Ill. App. 3d at 120-21. Ultimately, a trial court is given discretion in the scope of closing argument and its judgment as to the propriety of the comments therein will not be reversed unless the remarks are of a character that prevented a fair trial. See *Weisman*, 368 Ill. App. 3d at 62.

¶ 30    Based on our review of the record before us, we find that the cited comments do not merit reversal, nor was it error for the trial court to allow them. The comments did not cause any substantial prejudice against defendant because they were all supported by facts in evidence before the jury. For example, it was always undisputed that Dr. Galbraith was a "hired" witness. During the parties' expert witness disclosures before trial, this was already evident. And, at the outset of his testimony, Dr. Galbraith himself testified on direct examination that he had been hired to review this case. He even volunteered for the jury, in his own words, that while some would classify his work as being "a hired gun," he was not one. Regarding the comment about his "career," it is true that, as defendant brought out during trial, Dr. Galbraith had a long and commendable career as a treating doctor; clearly,

he worked for the Mayo Clinic, published articles and had dozens of staff appointments at different hospitals around the country. However, as was brought out by defendant herself, in the last several years, Dr. Galbraith's entire professional time has been devoted to being an independent contractor providing "medicolegal" services. He does not treat patients or practice medicine anymore. Undeniably, and by his own admission, then, reviewing medical-legal cases, consulting on them and testifying in court is currently Dr. Galbraith's "career." Moreover, Dr. Galbraith went on to testify before the jury that he is employed as a consultant for some four or five different companies that provide medical consultations in legal matters, and that 99% of the time he works for defendants. He also told the jury not only the fact that he is compensated for this work, but discussed specifics with respect to how much he is paid.

¶ 31    It is clear to us that, in light of this, there was no error here. All of plaintiff's remarks made during opening statement and closing argument about Dr. Galbraith were borne out by the evidence presented at trial. Accordingly, we find no prejudice and will not reverse the jury's verdict on this ground.

¶ 32    We further find no error in plaintiff's comments about defense counsel, which defendant classifies as a personal attack. Again, plaintiff told the jury at the end of trial that defense counsel did not "like the evidence" and was talking "out of both sides of their mouth." First, we do not read such statements to constitute a personal attack. Rather, these were simply natural observations made by an attorney of his opposing counsel. Clearly, defendant did not "like the evidence" presented on plaintiff's behalf from her expert Dr. Kohn and that is why she presented the testimony of her own expert, Dr. Galbraith. Moreover, in reviewing the record, we note that plaintiff made these comments about defense counsel during *rebuttal* closing argument and in light of defense counsel's consistent and repeated comments before the jury in her own closing argument that plaintiff was not being honest in her symptoms or, at the very least, there was no "objective" evidence regarding them. In fact, plaintiff's honesty about her pain was something Dr. Galbraith mentioned more than once in his testimony. During closing argument, plaintiff reviewed this and noted, contrary to defense counsel's insinuation, that even Dr. Galbraith finally admitted he believed plaintiff was being honest about her pain. If anything, then, plaintiff's comments regarding defense counsel obviously comprised an invited response to defense counsel's theory of the case and, thus, were proper. See, *e.g.*, *People v. Nieves*, 193 Ill. 2d 513, 534 (2000) (when defendant's closing argument attacks State's case, State is entitled to respond).

¶ 33    Therefore, pursuant to our discussion, we find that the trial court did not abuse its discretion in overruling defendant's objections to the cited comments made by plaintiff regarding Dr. Galbraith and defense counsel during her opening statement and closing argument.

¶ 34                    B. Trial Court's Ruling Regarding Yarrow

¶ 35    Defendant's next claim of error centers on its ruling regarding occurrence witness Yarrow. As noted earlier, before trial, plaintiff took the evidence depositions of her coworkers Yarrow and Dobbs, who were both present at the time of the accident. When the case went to trial, defendant moved to bar their testimony. However, after defendant admitted

liability, plaintiff informed the court she would only be presenting the testimony of Dobbs, since Yarrow had not actually seen the impact. At this point, defendant withdrew her motion and asked the trial court if she could call Yarrow in the event plaintiff did not. The trial court denied this.

¶ 36    Defendant insists that the trial court improperly refused to allow her to call Yarrow to testify because plaintiff, who deposed her, elected not to call her as a witness. Defendant further argues that Yarrow's testimony was key to her case because it contradicted Dobbs regarding the nature of the impact, namely, regarding whether plaintiff was thrown in the air, whether she landed inside or outside the crosswalk, and whether she lost consciousness. We disagree.

¶ 37    The record in this cause reveals that, in contradiction to defendant's characterization that the trial court denied her request because plaintiff, rather than defendant, had deposed Yarrow, the trial court's concerns were clearly very different. That is, upon reading its pretrial colloquy on this matter, the court made its ruling on the undeniable fact that defendant had never disclosed Yarrow as a witness in her Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007) witness disclosures. The court thoroughly discussed this with defendant, noting that it had no legal basis to allow her to call Yarrow because Yarrow "wasn't [the defense's] witness and never was [the defense's] witness." After the court reminded defendant of this fact, defendant looked over her Rule 213 disclosures and admitted to the court that it was right: she never disclosed Yarrow as a witness for the defense.

¶ 38    The Illinois Supreme Court rules regarding discovery are mandatory rules of procedure that the courts and counsel are mandated to follow. See *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 849 (2010); *Warrender v. Millsop*, 304 Ill. App. 3d 260, 268 (1999). This is particularly true of Rule 213(f), which governs the disclosure of witnesses for trial. See, *e.g.*, *Wilbourn*, 398 Ill. App. 3d at 849; *Warrender*, 304 Ill. App. 3d at 268. Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) allows a trial court to impose sanctions, including barring a witness from testifying at trial, when a party fails to abide by witness disclosure rules. See *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 620 (2007). The imposition of such a sanction is within the trial court's discretion, and the court's decision of what sanction to impose will not be disturbed on appeal absent abuse of that discretion. See *Nedzvekas*, 374 Ill. App. 3d at 620. When examining the trial court's decision, we are to consider several factors, such as surprise to the opposing party, the prejudicial effect of the witness's testimony, the nature of the testimony, the diligence of the adverse party, the timeliness of the objection and the good faith of the party offering the testimony. See *Nedzvekas*, 374 Ill. App. 3d at 620. No one factor is determinative, and each case presents a unique factual situation that must be considered independently when reviewing the propriety of the particular sanction. See *Nedzvekas*, 374 Ill. App. 3d at 620. Again, the ultimate decision regarding the admissibility of evidence lies within the sound discretion of the trial court and will not be reversed unless that discretion was clearly abused. See *Wilbourn*, 398 Ill. App. 3d at 847-48 (abuse occurs only when no reasonable person would adopt court's view, and party seeking reversal bears burden of establishing required substantial prejudice).

¶ 39    In the instant cause, the record is quite clear that defendant failed to comply with discovery rules when it came to calling Yarrow as a witness for her case. She admitted this

to the trial court during its colloquy on the matter. Her excuse was that she could "only guess" that she did not disclose Yarrow because she was "unaware that [Yarrow] was an actual witness" and "only learned of her testimony at her evidence deposition." However, even at that point, defendant did not attempt to add Yarrow as a witness for the defense. Instead, as the record shows, defendant actually filed a motion to bar Yarrow's testimony from trial. Ultimately, and contrary to defendant's characterization of the court's colloquy, it did not matter to the trial court who had deposed Yarrow. Rather, its conclusion was that, since defendant never took the time to disclose her according to Rule 213(f), she could not call her as a witness now.

¶ 40       Reviewing the trial court's decision, we find that it was well within its discretion to bar Yarrow's testimony. Once the court pointed out defendant's discovery omission before trial, defendant no longer argued the point and never made an offer of proof regarding Yarrow. In addition, we do not believe, as defendant insists, that Yarrow's testimony would have been relevant here. Again, while Yarrow was present at the accident, she did not see the actual impact of defendant's SUV hitting plaintiff. Accordingly, and again contrary to defendant's insistence, Yarrow could not have testified regarding whether plaintiff was thrown in the air, nor was her observation that plaintiff was lying in the crosswalk after the accident at all relevant to whether she was in the crosswalk at the time she was hit. Similarly, any testimony Yarrow could have provided stating that plaintiff never lost consciousness would have been immaterial. While plaintiff testified she could not remember whether she lost consciousness, Dobbs, who actually saw what had happened, testified unequivocally that plaintiff did not lose consciousness. Thus, the same statement from Yarrow, who admitted she had not seen what happened, would have been, at best, redundant.

¶ 41       Therefore, based on the record before us, we find that the trial court did not abuse its discretion in barring defendant from calling Yarrow as a witness for the defense after defendant failed to disclose her as a witness and her testimony would have been immaterial to the pertinent issues at trial.

¶ 42                                    C. Trial Court's Ruling Regarding Heerema

¶ 43       Defendant's third claim of trial court error is her assertion that the court improperly denied her motion to bar plaintiff's friend and coworker Heerema from testifying as a lay witness and giving "unqualified subjective opinions" as to plaintiff's "mental status" after the accident. She claims that Heerema's testimony did not have a proper foundation because it was not based on "objective facts." We disagree.

¶ 44       Again, the decision whether to admit evidence lies within the sound discretion of the trial court and will not be reversed unless that discretion was clearly abused. See *Wilbourn*, 398 Ill. App. 3d at 847-48. This includes the admission of lay witness testimony. See *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 580 (1993). While it is true that a lay witness should not be permitted to testify to a legal conclusion at issue (see *Town of the City of Bloomington v. Bloomington Township*, 233 Ill. App. 3d 724, 735 (1992)), a lay witness can express an opinion on an issue in a cause if that opinion will assist the trier of fact (see *Zoerner*, 250 Ill. App. 3d at 580). Accordingly, as long as this opinion is based on the witness's personal

observation, is one that a person is generally capable of making, and is helpful to a clear understanding of an issue at hand, it may be permitted at trial. See *Zoerner*, 250 Ill. App. 3d at 580 (the opinion must be rationally based on the witness's perception and be helpful to the witness's testimony or to resolving a fact at issue).

¶ 45 Interestingly, here, defendant's motion to bar Heerema sought to prohibit her from testifying as to any medical opinions she would try to give in her capacity as an occupational therapist; after all, the case involved neurological injury to someone who, along with her coworkers, spent her life working in this very field. The court reassured defendant that it would not permit Heerema to testify in that capacity but, rather, only as a friend who knew plaintiff before the accident and had observed her after it.

¶ 46 And, upon our review of the record, this is exactly what occurred. Heerema was plaintiff's friend and coworker for some 25 years. She testified that, before the accident, she would see plaintiff about twice a year and knew her to be a high-functioning, intelligent woman who was confident and often spoke in front of large groups of coworkers at conferences as part of the responsibilities of her job. Heerema further testified that she saw plaintiff 10 days after the accident and immediately noticed that she was experiencing mental impairment. Not only could plaintiff not figure out where she was going, but she could not even remember her long-time friend's name; clearly, plaintiff was not "acting like herself." In addition, Heerema testified that, once plaintiff changed jobs, she saw her more often, about every two months, and noticed her to be slower to respond, make mistakes, and experience memory problems–unlike the person she was before.

¶ 47 From all this, the record is clear that Heerema had ample opportunity to observe both plaintiff's physical condition and mental status and, thus, had a proper foundation as a lay witness to testify as to her personal observations regarding these. We find nothing in our reading of her testimony to suggest, as defendant claims, that she testified to matters beyond her observations or that she made observations that were beyond those any person who has known and worked with another for over 25 years is capable of making. In addition, Heerema's testimony clearly went to a central issue of the trial–plaintiff's injuries from the accident. Therefore, we find no abuse of discretion on the part of the trial court in allowing Heerema to testify as she did at trial.

¶ 48 D. Trial Court's Ruling Regarding Dr. Kohn

¶ 49 Defendant next claims that the trial court erred in denying her motion to bar Dr. Kohn from testifying as a rebuttal witness. She asserts that, because Dr. Galbraith did not present any new, affirmative matters requiring rebuttal, Dr. Kohn's opinions were only cumulative of Dr. Chaisson's testimony and, thus, did not constitute proper rebuttal evidence. We disagree.

¶ 50 If a defendant presents an affirmative matter to support her case-in-chief, the plaintiff has the right to present evidence in rebuttal to that matter. See *Chapman v. Hubbard Woods Motors, Inc.*, 351 Ill. App. 3d 99, 106 (2004). Such rebuttal evidence is admissible if it explains, repels, contradicts or disproves the evidence presented. See *Chapman*, 351 Ill. App. 3d at 106; *Lagestee v. Days Inn Management Co.*, 303 Ill. App. 3d 935, 942 (1999) (quoting

*People ex rel. Mendez v. Villa*, 260 Ill. App. 3d 866, 870 (1994)). Just as with the admission of any evidence, the decision whether to admit rebuttal evidence lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. See *Chapman*, 351 Ill. App. 3d at 106; *Hoem v. Zia*, 239 Ill. App. 3d 601, 619 (1992). Regarding rebuttal evidence in particular, abuse occurs only when a party is prevented from impeaching a witness, rehabilitating the credibility of an impeached witness, or responding to new points raised. See *Chapman*, 351 Ill. App. 3d at 106; *Hoem*, 239 Ill. App. 3d at 619.

¶ 51     We find no abuse of discretion in the trial court's decision to allow Dr. Kohn's testimony. In her pretrial Rule 213(f)(3) disclosures, defendant stated she would be calling Dr. Galbraith to testify that, in his expert medical opinion, plaintiff had not suffered either a closed head injury or any kind of traumatic brain injury, and that there was no objective test that would show she had. Plaintiff, in response, disclosed that she would be calling Dr. Kohn to rebut these opinions. And, this was, in fact, the information to which Dr. Kohn testified at trial. He discussed that he examined plaintiff both physically and mentally and looked over all of her medical records and radiological films. He also described the SPECT test he ordered for plaintiff, which he explained was an objective brain imaging study. He testified that, contrary to Dr. Galbraith's opinion, this test showed abnormalities in plaintiff's brain function, consistent with the accident in which she hit her head. From all this, he concluded that Dr. Galbraith was mistaken in his opinions and, instead, Dr. Kohn opined that plaintiff had suffered a mild traumatic brain injury, a concussion and postconcussion syndrome with permanent symptoms that would require future medical care and treatment.

¶ 52     Dr. Kohn's testimony here was not, as defendant insists, merely cumulative of Dr. Chaisson's. To the contrary, while they may have been along the same lines and reached very similar medical conclusions after reviewing the same scenario, their testimony was also very different. Dr. Chaisson mainly testified regarding plaintiff's actual treatment; Dr. Chaisson was, as noted, plaintiff's treating physician. Dr. Kohn, meanwhile, testified as a medical expert who reviewed plaintiff's case and, thus, provided an entirely different perspective. For example, Dr. Kohn, unlike Dr. Chaisson, was able to challenge Dr. Galbraith's medical opinions, particularly with his use and discussion before the jury of the SPECT test–an objective, medically diagnostic tool that Dr. Galbraith, who had stopped practicing medicine some 10 years ago, admitted he had never even heard of before this trial. From this example alone, it is clear that Dr. Kohn's testimony, which was used to contradict and disprove that of Dr. Galbraith on an expert level, was proper rebuttal evidence and not merely cumulative.

¶ 53     As a side note on this topic, we acknowledge defendant's repeated notations that the admission of Dr. Kohn's testimony was further compromised because it came before, rather than after, that of Dr. Galbraith. Defendant is correct that Dr. Kohn, essentially, testified "out of turn." The record shows that, instead of testifying after Dr. Galbraith, which is typical when a witness is called to specifically rebut the testimony of another, Dr. Kohn testified before Dr. Galbraith to accommodate a scheduling issue at trial. Accordingly, as defendant notes, by the time Dr. Kohn testified, the jury had already heard from Dr. Chaisson, but not yet from Dr. Galbraith.

¶ 54     However, in our view, what occurred here did not disqualify Dr. Kohn as a rebuttal witness or somehow make him less of one. We have already discussed that his testimony,

-13-

while in the same vein as that of Dr. Chaisson, was not solely cumulative of hers. In addition, any prejudice that could have resulted from Dr. Kohn's testimony as a rebuttal witness was actually wiped away, in defendant's favor no less, precisely because he testified "out of order." That is, instead of countering Dr. Galbraith's testimony and leaving defendant without the opportunity to have the last word on the medical evidence, as would have been the case if Dr. Kohn testified after Dr. Galbraith, the complete opposite occurred. With Dr. Kohn testifying before Dr. Galbraith, defendant had the chance to use Dr. Galbraith to attack Dr. Kohn's testimony, word for word, before the jury. Moreover, because of the sequence of testimony, there was no concern, as there may be with other rebuttal witnesses, that defendant did not have the opportunity to impeach Dr. Kohn, rehabilitate Dr. Galbraith's credibility, or responded to Dr. Kohn's points.

¶ 55    From all this, we find that the trial court did not err in allowing Dr. Kohn to testify as a rebuttal witness at trial.


¶ 56                           E. Evidence of Plaintiff's Treatment

¶ 57    Defendant's final claim of trial court error involves testimony regarding plaintiff's treatment following the accident. Defendant contends that the trial court erred in allowing the jury to hear testimony and argument that plaintiff did not continue with physical therapy because of the cost. She points to two statements in the record made by plaintiff that she did not continue to see physical therapist Bookhout after the accident because the therapy was costly, and to a comment made by plaintiff's counsel during closing argument that the therapy was costly. Defendant insists that these statements were unduly prejudicial because they improperly evidenced the wealth of the parties and, thus, the trial court's decisions to overrule her trial objections to these comments amounted to reversible error. Again, we disagree.

¶ 58    First, we wish to note some mischaracterizations presented by defendant in her brief on appeal. Defendant refers to three different instances here. Regarding the first, the record shows that, as she cross-examined plaintiff during her testimony, defendant attempted to suggest to the jury that plaintiff stopped seeing Bookhout of her own accord because she was no longer in pain, and asked her if it was true that she had not seen Bookhout in the last 15 months. Plaintiff responded to defendant's question by saying that the physical therapy was costly. Defendant objected, and the trial court sustained her objection. In the second instance, defendant continued cross-examining plaintiff on this topic and elicited that plaintiff did not, at this point in time, have an appointment with Bookhout to continue her therapy. On redirect examination, in an attempt to deal with defendant's suggestion that plaintiff stopped seeing Bookhout because she did not need additional treatment, plaintiff's counsel asked her why she no longer saw Bookhout. Plaintiff again testified that physical therapy was too costly. Defendant objected, but this time, the trial court overruled her objection. Finally, regarding the third instance, plaintiff, during closing argument, noted for the jury that this lawsuit was the only opportunity she would have to recover for her injuries and, particularly, that she could not come back later against defendant seeking compensation for more "costly" physical therapy or other treatment. Defendant objected, and the trial court overruled her objection.

¶ 59    From this, it is clear that there was no error here. Again, in the first instance, the trial court actually sustained, and did not overrule, defendant's objection. Thus, she cannot complain in this regard. As to the second instance, the record shows that plaintiff's comment came in response to defendant's intimation to the jury that plaintiff did not currently have an appointment with Bookhout and had stopped seeing him because she felt she did not need additional treatment. Defendant's suggestion clearly invited plaintiff's response as to why she was no longer seeing Bookhout, particularly because defendant knew from plaintiff's deposition, as contained in the record, that her insurance was no longer covering her physical therapy. Finally, the trial court had no basis to sustain plaintiff's counsel's comment during closing argument because it was, simply put, true: what the jury chose to award plaintiff would constitute the end of her case and she would not be able to return to court later to claim more money for any future, and costly, treatment.

¶ 60    In addition, we find the recent decision of *Vanoosting v. Sellars*, 2012 IL App (5th) 110365,[1] to be instructive here. Briefly, in *Vanoosting*, the plaintiff sued the defendant after he rear-ended her car. She sought damages for her injuries, including past and future pain and suffering. Just as in the instant case, the defendant admitted negligence, and the cause proceeded to a jury trial on damages only. Before trial, the plaintiff filed a motion *in limine* seeking to introduce evidence that she did not have medical insurance as the explanation for the defendant's claim that she sought little or no medical treatment in the last three years. The trial court denied the plaintiff's motion and told the parties it did not think it would become an issue. The plaintiff, however, made clear her concerns that any mention of the fact that she had not seen a doctor in so long may cause the jury to infer that she was no longer in pain which would affect her claim for future pain and suffering, and suggested that she should be allowed to explain her reasons for not seeking further treatment (*i.e.*, no medical coverage and could not otherwise afford it). Later, at trial, several instances arose in which the defendant continued to make reference to the plaintiff's three-year gap in treatment, and the plaintiff was prevented from testifying as to why. The jury returned a verdict in favor of the plaintiff, but did not award her anything for future medical expenses. See *Vanoosting*, 2012 IL App (5th) 110365, ¶¶ 3-20.

¶ 61    On appeal, the reviewing court discussed the principles of relevant evidence and unfair prejudice, and concluded that the evidence the plaintiff sought to introduce regarding her financial position and lack of medical insurance should have been admitted and the trial court had committed reversible error in excluding it. See *Vanoosting*, 2012 IL App (5th) 110365, ¶¶ 22-24. This was because the evidence related directly to a contested point at issue, namely, the extent of the plaintiff's injuries and whether she should be entitled to an award for future pain and suffering. See *Vanoosting*, 2012 IL App (5th) 110365, ¶ 25. The *Vanoosting* court noted that this was particularly true in light of the circumstances of that case, where the defendant continuously pointed out to the jury in his cross-examination of witnesses and in closing argument that the plaintiff had not received medical treatment in the last three years.

---

[1]We note for the record that in July 2006, after appellate briefing but before oral argument was held in this matter, plaintiff moved to cite *Vanoosting* as supplemental authority regarding this issue. After considering her motion, as well as defendant's response thereto, we granted it.

See *Vanoosting*, 2012 IL App (5th) 110365, ¶ 25.

¶ 62    The instant cause mirrors *Vanoosting* and merits the same result. Defendant here repeatedly insinuated to the jury that plaintiff had stopped seeing Bookhout and receiving physical therapy after the accident of her own accord because she was not really in pain anymore and felt she no longer needed this treatment. Such intimation was in direct contradiction to the evidence and testimony that plaintiff presented, *i.e.*, that she needed ongoing and future care for her persistent injuries from the accident. Accordingly, and just as in *Vanoosting*, the contested testimony went precisely to a central controversy of the case–the extent of plaintiff's injuries and whether she is entitled to damages for future pain and suffering/medical treatment. And, just as in *Vanoosting*, this is particularly significant in light of defendant's strategy of consistently highlighting that plaintiff had stopped seeing Bookhout. Therefore, the trial court in the instant cause properly allowed plaintiff's testimony in this regard.

¶ 63    For these reasons, we find that the trial court did not abuse its discretion in allowing plaintiff to testify that she eventually stopped her physical therapy because of the cost.

¶ 64    Ultimately, based on the record before us, we conclude that none of the five instances cited by defendant on appeal, either individually or in combination, demonstrated trial court error in any form, nor did they deprive her of a fair trial in any way as to require reversal of the jury's verdict in favor of plaintiff.

¶ 65                        II. Manifest Weight and Remittitur

¶ 66    Defendant's second, and final, contention on appeal is that the jury's verdict and the trial court's judgment entered thereon were contrary to the manifest weight of the evidence and should be vacated for a new trial or a remittitur. She maintains that, because the record shows plaintiff did not lose consciousness, continued to work for a time at her full-time job, had no significant findings on any neurological examinations, had only subjective pain and could still perform many of the same activities she did before the accident, the judgment was clearly contrary to the manifest weight of the evidence. Alternatively, she argues that, because plaintiff's medical expenses totaled only $25,824.34, the verdict of $713,601.82 was clearly excessive and must immediately be reduced. We disagree with both of defendant's arguments here.

¶ 67    Again, a reviewing court will set aside a jury verdict only if it is against the manifest weight of the evidence, that is, only if the jury's findings are unreasonable, arbitrary and not based on the evidence presented, or if the opposite conclusion is clearly apparent. See *Barth*, 371 Ill. App. 3d at 509. Moreover, a remittitur should be employed only when a jury's award falls outside the range of fair and reasonable compensation, appears to be the result of passion or prejudice, or is so large that it shocks the judicial conscience; it should not be ordered if the award " 'falls within the flexible range of conclusions which can reasonably be supported by the facts.' " *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 1072 (2000) (quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992)). There is no mathematical formula for deciding whether a jury award is fair and reasonable. See *Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562, 572 (2004); accord *Epping*, 315 Ill.

App. 3d at 1072 (there is "no litmus test" and this is why we must examine the record in each case). Some factors to consider include the extent of the injuries suffered and the permanency of the plaintiff's condition, the plaintiff's age, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries. See *Carroll*, 349 Ill. App. 3d at 572; accord *Epping*, 315 Ill. App. 3d at 1072. While the question of whether a remittitur should be granted is generally one of law, the assessment of damages is primarily an issue of fact for the jurors and, thus, deference must be given to the careful deliberative process the jury employs on this issue. See *Epping*, 315 Ill. App. 3d at 1073 (damages award " 'must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury and the judgment of the trial court' " (quoting *Kopczick v. Hobart Corp.*, 308 Ill. App. 3d 967, 979 (1999))); see also *Carroll*, 349 Ill. App. 3d at 572. Therefore, as we have stated, we will not reverse the jury's award unless it is unreasonable, shocking or the result of prejudice. See *Carroll*, 349 Ill. App. 3d at 571.

¶ 68    First, based on our thorough review of the record in the instant cause, we do not find that the verdict against defendant and in favor of plaintiff was against the manifest weight of the evidence. Again, defendant admitted liability; while stopped at a signal waiting to turn, she took her foot of the brake of her SUV and began to accelerate, hitting plaintiff while plaintiff was a pedestrian crossing the street in front of her. Therefore, we do not see how any opposite conclusion could be reached based on this.

¶ 69    Moreover, we further find that a remittitur is not warranted here for any reason. In light of the record, the amount the jury awarded to plaintiff was not unreasonable, shocking or the result of prejudice. The evidence showed that, before this accident, plaintiff was a 47-year-old, intelligent, high-functioning, active adult who held a full-time competitive job and performed many social and outdoor activities with her family. After the accident, plaintiff began to suffer marked cognitive, emotional and physical difficulties. She was confused, could not remember her long-time friend's name, had to change jobs, got easily frustrated, suffered from depression and could not operate at the same level she did before. Significantly, she is in pain on a daily basis. She experiences headaches, is now quite sensitive to light and sound, has numbness and neck pain, and has difficulty sleeping; she has to take pain medication before and after she wants to participate in many of the same activities she used to easily perform before. She was diagnosed with a closed head injury and neurological tests showed abnormalities in her brain. Several medical witnesses, who consistently treated her and reviewed of all her medical records, testified that her condition was permanent and that she would need future medical care and treatment. They also testified that her pain and symptoms will become more of a problem over time. None of these factors, when taken in combination or even alone, supports defendant's request for a remittitur. To the contrary, the jury's breakdown of its award was appropriate and in line with the evidence presented at trial.[2] While it may be true, as defendant points out, that plaintiff's medical bills amounted to only $25,824.34, the jury made clear that its award contained more

_____

[2]We note for the record that defendant neither argues the itemization of the jury's monetary award nor attacks its specifics, not even its award for future medical costs. Rather, she makes her argument on generalities only. Accordingly, we do the same.

-17-

than this, such as compensation for plaintiff's past and future loss of normal life, past and future pain and suffering, future medical costs and lost earnings.

¶ 70      Ultimately, based on all this, we find that defendant's final arguments here lack any merit and do not support reversal of the jury's verdict or the trial court's judgment thereon, nor warrant a remittitur.

¶ 71                          CONCLUSION

¶ 72      Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 73      Affirmed.