2019 IL App (1st) 181878-U
No. 1-18-1878

SECOND DIVISION
December 24, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| US BANK, Special Administrator of the Estate of JAMES MERTINS, deceased, and JACQUELINE MERTINS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellants, | ) ) | |
| v. | ) ) | |
| WILLIAM MORAN, M.D.; DR. DAVID FEERST, Individually, and as Agent, Servant, and/or Employee of DAVID FEERST, M.D., S.C., a Corporation; NORTHWEST COMMUNITY HOSPITAL; RICHARD BAKER, D.O., Individually and as Agent, Servant, and/or Employee of BEST PRACTICES INPATIENT CARE, LTD.; and BEST PRACTICES INPATIENT CARE, LTD., | ) ) ) ) ) ) ) ) ) ) ) ) | No. 13 L 4804 The Honorable Robert E. Senechalle, Jr., Judge Presiding. |
| Defendant-Appellees. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The judgment of the circuit court is affirmed where (1) defendants made references in opening statement and closing argument to facts properly entered into evidence at trial regarding the medical treatment of undeposed doctors not called as witnesses, and the references were not prejudicial, as plaintiffs were aware of the undeposed doctors; (2) defense counsel's comments in

closing argument did not violate the "golden rule, and the trial court cured any possible prejudice from the alleged "golden rule" argument; and (3) plaintiffs failed to present a *prima facie* case that a defendant physician acted as an apparent agent for the defendant hospital.

¶ 2 Following a jury trial in this medical malpractice action, judgment was entered in favor of defendants William Moran, M.D. (Dr. Moran); Dr. David Feerst, individually, and as agent, servant, and/or employee of David Feerst, M.D., S.C., a corporation (Dr. Feerst); Northwest Community Hospital (Northwest); Richard Baker, D.O., individually and as agent, servant, and/or employee of Best Practices Inpatient Care, Ltd. (Dr. Baker); and Best Practices Inpatient Care, Ltd. (Best Practices), and against plaintiffs, US Bank, special administrator of the estate of James Mertins, deceased (U.S. Bank), and Jacqueline Mertins. On appeal, U.S. Bank and Jacqueline Mertins argue that the trial court erred in (1) permitting defendants' attorneys to comment in opening statement and closing argument regarding the opinions and observations of undeposed doctors, whom defendants did not disclose as witnesses; (2) denying plaintiffs' motion for mistrial where counsel for Dr. Feerst violated the "golden rule" in closing argument; and (3) entering a directed verdict finding the evidence did not show Dr. Baker acted as an apparent agent for Northwest. We affirm.

¶ 3 BACKGROUND

¶ 4 Because the record in this matter is extensive, we recount only the information necessary to understand our disposition of the issues on appeal. Before addressing the proceedings and evidence regarding each of the issues on appeal, we will first outline the facts of the case more broadly, as they relate to defendants' alleged breaches of the standard of care and the proximate cause of Mr. Mertins's injuries.

¶ 5      I. Facts of the Case

¶ 6      U.S. Bank and Jacqueline Mertins's medical malpractice claims alleged that Drs. Moran, Feerst, and Baker, acting as agents of Northwest, failed to obtain and communicate information regarding James Mertins's history of idiopathic left ventricular tachycardia (ILVT), and did not consult a cardiologist for Mr. Mertins. Defendants then discharged Mr. Mertins "with a low pulse rate on a reduced dose of verapamil." Plaintiffs alleged that as a result of these negligent acts, Mr. Mertins received permanent injury. Mr. Mertins was originally listed as a plaintiff in this case. However, during pretrial proceedings, Mr. Mertins died on July 26, 2016, and U.S. Bank was named a plaintiff as special administrator for Mr. Mertins's estate.

¶ 7      At trial, the testimony generally showed that Mr. Mertins had a history of ILVT, a condition in which the heart's left ventricle pumps abnormally fast. Mr. Mertins's medical history also included chronic hypertension, a potentially fatal blood clot, morbid obesity, prostate cancer, and a heart conduction disorder. For several years prior to his hospital admissions in 2012, Mr. Mertins had received a medication called verapamil, which can treat ILVT and chronic hypertension.

¶ 8      On February 11, 2012, Mr. Mertins was admitted into Northwest due to reported lightheadedness and heart palpitations. He was treated by Dr. Moran, who was covering for Mr. Mertins's primary care physician, Dr. Feerst. In the emergency room, an EKG was performed, and Mr. Mertins received a primary diagnosis of "[n]ear syncope and conduction disorder of the heart." Mr. Mertins was seen by a cardiologist, but displayed no more active cardiac issues and was discharged.

¶ 9      On June 28, 2012, Mr. Mertins entered the intensive care unit (ICU) at Northwest due to symptoms of Still's disease, namely, high fevers, severe joint pain, and dangerously low blood pressure. During this admission, Dr. Feerst served as Mr. Mertins's attending physician. On July

1, 2012, Mr. Mertins was removed from the ICU. On July 4, Dr. Moran covered for Dr. Feerst as Mr. Mertins's attending physician. On the morning of July 5, Dr. Moran placed Mr. Mertins on a half dose of verapamil, to be taken only "within certain blood pressure parameters." Dr. Feerst signed back onto Mr. Mertins's case, but Mr. Mertins told Dr. Feerst that he wanted a different physician. Dr. Feerst informed Mr. Mertins he would find a "hospitalist" and contacted Best Practices, who assigned Dr. Baker to treat Mr. Mertins starting July 5. Mr. Mertins received verapamil on July 1, but not on July 4 and 5. Then, on July 6, Mr. Mertins received half a dose of verapamil and was discharged from the hospital by Dr. Baker. Throughout this admission, no doctors consulted a cardiologist for Mr. Mertins.

¶ 10    On July 7, 2012, Mr. Mertins was found unresponsive at his house. A paramedic arrived in response to a call for cardiac arrest and was unable to feel a pulse on Mr. Mertins's neck or wrist. The paramedic helped Mr. Mertins regain a pulse and transported him to Northwest. Mr. Mertins suffered anoxic brain damage, which can result from the heart not pumping sufficient oxygen into the brain for a certain duration of time. On July 8, at 1:30 a.m., Mr. Mertins suffered a cardiac arrest and was resuscitated. He was then discharged from Northwest and taken to a nursing facility. In May 2016, Mr. Mertins underwent abdominal surgery, from which he received a wound infection. Mr. Mertins developed sepsis and eventually died. His death certificate listed cerebrovascular accident, sepsis, and "failure to thrive" as causes of death.

¶ 11    Plaintiffs called Drs. Jay Schapira, Michael Crawford, and Benny Gavi as their main expert witnesses. Plaintiffs' testimony generally stated that defendants failed to identify and consider Mr. Mertins's history of ILVT, failed to consult a cardiologist, and improperly discharged Mr. Mertins from Northwest with a reduced dosage of verapamil. As a result, Mr. Mertins suffered a cardiac

arrest at home on July 7, which caused Mr. Mertins to suffer permanent brain damage and eventually die.

¶ 12    Dr. Schapira, a cardiologist, testified that Dr. Moran violated the standard of care by failing to consult a cardiologist and failing to communicate Mr. Mertins's cardiac condition to Dr. Feerst. Dr. Schapira also testified that Dr. Baker violated the standard of care by discharging Mr. Mertins without consulting a cardiologist. Based on Mr. Mertins's EKG on June 28, 2012, which reflected an "abnormal EKG" and "prolonged QT interval," defendants should have consulted a cardiologist. Also according to Dr. Schapira, defendants' violations of the standard of care contributed to Mr. Mertins's permanent anoxic brain damage, which could occur once a patient was "down" for more than 10 minutes. Dr. Schapira stated that Mr. Mertins suffered brain damage following his cardiac arrest at home, and not the cardiac arrest at Northwest, because Mr. Mertins would not have been resuscitated as quickly at home.

¶ 13    On cross-examination, Dr. Schapira testified that he had seen five to 10 patients with ILVT. As to the issue of whether Dr. Moran breached a standard of care by failing to communicate Mr. Mertins's ILVT, Dr. Schapira confirmed that both Drs. Moran and Feerst knew Mr. Mertins was "off of verapamil" and had ILVT. Nonetheless, Dr. Schapira maintained Dr. Moran should have told Dr. Feerst that Mr. Mertins's "abnormal" EKG readout showed "QT prolongation." Dr. Schapira also acknowledged that Dr. Feerst saw Mr. Mertins for several days following the EKG. As to Dr. Baker, counsel for Dr. Baker elicited testimony that several physicians had seen Mr. Mertins prior to Dr. Baker but did not communicate the need for a cardiologist to him.

¶ 14    On direct examination from plaintiffs, cardiologist Dr. Crawford testified that Dr. Feerst violated the standard of care by not consulting a cardiologist or communicating Mr. Mertins cardiac issues to the other doctors. Further, Dr. Crawford stated that Mr. Mertins already had a

lower heart rate, and verapamil is known to lower heart rates. Thus, when he was discharged and given verapamil "for the first time in days," the verapamil "caused a lack of adequate perfusion to his heart," which incited ventricular arrhythmias and a cardiac arrest. As a result, Mr. Mertins suffered a cardiac arrest at home, resulting in anoxic brain damage. Mr. Mertins was then placed in a nursing home, was unable to eat, had a catheter inserted in his bladder, developed sepsis from wounds following surgery, and eventually died.

¶ 15    Dr. Crawford also testified that he had only seen "three to five" patients with idiopathic ventricular tachycardia (IVT), and one of those patients suffered a cardiac arrest. In Dr. Crawford's opinion, IVT caused the patient's arrest. On cross-examination from the defense, however, Dr. Crawford stated he did not know if that one patient's condition was ILVT, which is a specific type of IVT. He also denied having records of the patient's treatment, which would have dated back to the 1990s, and stated he did not treat the patient until after the cardiac arrest. Additionally, Dr. Crawford confirmed on cross-examination that ILVT is a rare condition that "ordinarily *** is not a problem in patients with healthy hearts," and that Mr. Mertins "had a heart that was free of structural problems."

¶ 16    Hospitalist and "internal medicine doctor" Dr. Gavi testified that Dr. Baker breached the standard of care by "failing to familiarize himself" with Mr. Mertins's "potentially life-threatening condition" of ILVT, by failing to consult a cardiologist, and by discharging Mr. Mertins "without getting a cardiologist involved." Dr. Gavi also acknowledged that Dr. Baker stated he was not aware of Mr. Mertins's ILVT. According to Dr. Gavi, this lack of awareness resulted from a failure to communicate, and Dr. Baker should have read Dr. Moran's note on July 4, which stated, "VT." Dr. Gavi stated that Dr. Baker's violations of the standard of care caused Mr. Mertins to have a cardiac arrest leading to anoxic brain damage. Additionally, Dr. Gavi testified that Dr. Baker and

Dr. Moran violated the standard of care by failing to recognize that IVT was potentially life-threatening.

¶ 17    Dr. Gavi also testified that over 20 years, he saw about 20 patients with IVT, that IVT is a rare condition, and that he was "not aware of ventricular tachycardia being a benign condition." Notably, Dr. Gavi testifiied regarding the various doctors who saw Mr. Mertins from June 28 to July 6, 2012, including Drs. Frishman, Furmanov, Rich, Suleiman, Cruz, Lidsky, Crane, and Tse. Then, on cross-examination, Dr. Gavi confirmed that "every one of the physicians *** charted their examination of Mr. Mertins's heart" and "listened for the same regular rate and rhythm."

¶ 18    Defendants called, in relevant part, Drs. Charles Kinder, Jeffrey Shanes, and Hiren Shah as expert witnesses. Cardiologist Dr. Kinder testified that Mr. Mertins's cardiac arrest was unforeseeable, and that Mr. Mertins's verapamil dose at the time of discharge was proper because it "was the right balance" between his "asymptomatic" bradycardia, which is an abnormally slow heart rate, and "his history of nonsustained ILVT." Dr. Kinder also stated that Mr. Mertins never had ILVT during his admission from June 28 to July 6, and he had no symptoms of bradycardia. Thus, even if called, a cardiologist would not have acted differently. Additionally, Dr. Kinder stated he "would not be worried about" the June 28 EKG readout "predicting a dangerous rhythm in the future." Based on the records of the paramedics who treated Mr. Mertins at his house, Dr. Kinder also concluded that Mr. Mertins's cardiac arrest was not a "ventricular fibrillation" arrest.

¶ 19    Cardiologist Dr. Shanes testified that Mr. Mertins's cardiac arrest on July 7 was "totally unpredictable and not foreseeable." Mr. Mertins did not need a cardiologist because he was "completely asymptomatic," and if called, a cardiologist would not have done anything different. Moreover, Dr. Shanes confirmed that it was unnecessary to communicate Mr. Mertins's history of ILVT because it was "a clinically-inactive problem." According to Dr. Shanes, ILVT is a "benign"

type of ventricular tachycardia that "can come and go," and is not associated with "sudden death," "palpitations," "cardiac disease," "coronary disease," or "anything catastrophic." People with "structural heart disease" can develop "more malignant types of ventricular tachycardia" that can lead to a cardiac arrest. Nonetheless, as plaintiffs' expert Dr. Crawford had confirmed, Mr. Mertins did not have a structural heart problem.

¶ 20    Dr. Shanes also stated that while Mr. Mertins was found to have bradycardia during his hospitalization, "the only time we do anything about it is if a patient is symptomatic." Dr. Shanes testified that "in a normally-structured heart, bradycardia is not associated with sudden death." As to the EKG, Dr. Shanes testified that the EKG readout was not concerning. According to Dr. Shanes, Dr. Tse even noted the "prolonged QT," but stated there was " '[n]o difference from the previous one.' " Moreover, because there was no evidence that Mr. Mertins had an active condition of cardiac disease, or that he was having chest pains, there was no reason to consult a cardiologist following the EKG.

¶ 21    Dr. Shah testified as to his expert opinion regarding whether defendants breached the standard of care, which corroborated the opinions of defendants' other experts. Dr. Shah added that Mr. Mertins was admitted to Northwest "for a rheumatologic condition." Further, a cardiologist was not necessary to address Mr. Mertins's abnormal blood pressure because internal medicine doctors are qualified to "evaluate trends in blood pressure" and make appropriate decisions accordingly. It was also proper to give Mr. Mertins a lower dose of verapamil when he was discharged because verapamil can lower heart rates, and Mr. Mertins already had a lower heart rate.

¶ 22     II. Pretrial Proceedings

¶ 23     Prior to trial, defendant Northwest filed motions for partial summary judgment, arguing that Drs. Feerst, Moran, and Baker were not agents of Northwest. The circuit court entered partial summary judgment, finding that Dr. Feerst was not an apparent agent of Northwest, and that Drs. Feerst, Moran, and Baker were not actual agents of Northwest. Thus, the remaining agency issues at trial were whether Drs. Moran and Baker acted as apparent agents of Northwest.

¶ 24     At the time that trial began, the following doctors, who saw and charted their treatment of Mr. Mertins from June 28 to July 6, 2012, were neither deposed nor called as witnesses: Dr. Kenneth Cruz,[1] Dr. David Frishman, Dr. Lo-Ku Chiang, Dr. Guy Kochvar,[2] Dr. Randy Rich, Dr. David Tse, Dr. Gilbert Sita,[3] Dr. Vern Kerchberger, Dr. Nathan Lidsky, and Dr. Kenneth Crane.

¶ 25     III. The Undeposed Doctors Not Called as Witnesses

¶ 26     Plaintiffs contend on appeal that defendants improperly remarked on the opinions and observations of the several doctors neither deposed nor disclosed as witnesses at the time of trial. For purposes of clarification, we observe that nothing in the record suggests that the *existence* of these doctors was "undisclosed," as plaintiffs only allege that they were not disclosed *as witnesses*. Their names are reflected extensively throughout the medical records entered into evidence, and plaintiffs never objected at trial to the evidence itself as not being disclosed in discovery.

---

[1] Counsel for Dr. Baker referenced in opening statement a critical care physician, who assessed Mr. Mertins with Dr. Lidsky, named either "Kenneth Kruse" or "Robert Kruse." Although plaintiffs include "Dr. Kruse" among the numerous undeposed doctors at issue on appeal, the record does not appear to reflect any other references to a critical care physician named "Dr. Kenneth Kruse" or "Dr. Robert Kruse" outside the opening statements and plaintiffs' motion to bar. The record also reflects that, much like Dr. "Kruse," Dr. Cruz was a critical care physician who assessed Mr. Mertins with Dr. Lidsky. The parties do not dispute that the names Dr. Cruz and Dr. Kruse refer to the same person.

[2] Throughout the record, there are references to a doctor named Kochvar and Kochar. The parties do not dispute that these names refer to the same person.

[3] The record contains references to a doctor named both Sita and Seda. However, the parties do not dispute that both names refer to the same person.

Accordingly, we will refer to the doctors as undeposed, and note that they were ultimately not called as witnesses at trial. Before describing the procedure at trial, we will briefly summarize the testimony and evidence presented throughout trial regarding each of the undeposed doctors.

¶ 27 Dr. Tse was an emergency room physician, and Dr. Sita was a cardiologist. The testimony presented at trial showed that on June 28, 2012, Dr. Tse ordered an EKG to be performed on Mr. Mertins. As previously noted, Dr. Tse noted the "prolonged QT," but stated there was " '[n]o difference from the previous one.' " Dr. Sita confirmed the EKG results and noted an "abnormal ECG," and "prolonged QT interval or TU fusion." Plaintiffs elicited extensive testimony regarding this EKG report and, during defendants' case-in-chief, moved to call Drs. Tse and Sita as rebuttal witnesses over the defense's objection. The trial court denied plaintiffs' motion because Drs. Tse and Sita had not been disclosed as witnesses. Defendants elicited testimony stating that the EKG report ultimately showed nothing "alarm[ing]." A "Emergency Department Chart" in the record states, among other things, that Dr. Tse confirmed that Mr. Mertins exhibited fever, low blood pressure, and kidney failure. The evidence in the record also contains numerous orders for treatment made by Dr. Tse on June 28, 2012, as well as the EKG readout, which states it is "[r]eferred" by Dr. Tse and "[c]onfirmed" by Dr. Sita.

¶ 28 Dr. Frishman was an infectious disease physician who saw Mr. Mertins multiple times as a consultant during Mr. Mertins's June-to-July admission. According to the motion brought by plaintiffs during trial to bar evidence regarding the undeposed doctors (motion to bar), Dr. Feerst disclosed Dr. Frishman as a witness in 2013; plaintiffs, Northwest, and Dr. Feerst disclosed Dr. Frishman as a witness in 2015; and Dr. Frishman was withdrawn as a witness in 2017.

¶ 29 Plaintiffs elicited testimony from their witness, Dr. Gavi, that Dr. Frishman was not consulted to consider Mr. Mertins's history of ILVT, and that Dr. Frishman documented a physical

examination of Mr. Mertins. Dr. Gavi also stated that Dr. Frishman examined Mr. Mertins's heart for "[p]robably about 15 seconds" and noted a regular heart rate. In adverse examination, plaintiffs' counsel questioned Dr. Moran regarding a report dated June 30, 2012, which reflected that Dr. Frishman was consulted due to Mr. Mertins's low blood pressure and fevers. Dr. Moran also confirmed that in this document, Dr. Frishman wrote, " 'This is certainly not clear as to what is going on.' " Dr. Frishman further wrote that " '[f]rom an infectious disease standpoint,' " he still had " 'some concern about an endovascular infection.' "

¶ 30    The defense elicited testimony that Dr. Frishman left a note dated June 29, 2012, which discussed Mr. Mertins's low blood pressure, but not ILVT or the need for a cardiologist. Dr. Frishman reported conducting a cardiac examination on Mr. Mertins, and saw Mr. Mertins on June 30, July 1, and July 4, but did not mention ILVT or recommend a cardiologist. Throughout the evidence in the record, Dr. Frishman's name is reflected several times in notes and orders for treatment.

¶ 31    Dr. Lidsky was an intensivist, a doctor who is experienced in treating "acutely ill" patients. On June 28, 2012, he saw Mr. Mertins in the ICU. Counsel for Dr. Baker elicited testimony that Dr. Lidsky performed a cardiovascular examination and noted a regular heart rate and rhythm. Plaintiffs' counsel elicited testimony that Dr. Crane left no documentation suggesting he was called to work up a known history of IVT or ILVT in Mr. Mertins. The evidence in the record contains notes from Dr. Lidsky with information that is consistent with the testimony at trial.

¶ 32    Dr. Cruz was a critical care doctor. The defense elicited testimony from plaintiffs' witnesses that on June 29, 2012, Dr. Cruz left a note reflecting that he and Dr. Lidsky assessed Mr. Mertins, but Dr. Cruz did not mention ILVT or recommend a cardiologist. Further, according to Dr. Cruz's note dated June 30, 2012, Dr. Cruz examined Mr. Mertins for 20 minutes, determined

Mr. Mertins's vitals were stable, and therefore decided Mr. Mertins could be moved from the ICU to the "regular floor." Plaintiffs elicited testimony that Dr. Cruz saw Mr. Mertins but was not consulted to "work up a known history" of Mr. Mertins's ILVT. The evidence in the record reflects numerous notes dated June 29 and 30 and bearing Dr. Cruz's name, with information consistent with the testimony at trial.

¶ 33     Dr. Chiang was a nephrologist, a physician who specializes in kidneys. The defense brought in testimony that Dr. Chiang saw Mr. Mertins on July 2, 2012, and that when Dr. Chiang documented the visit, he did not mention ILVT or the need for a cardiologist. Consistent with this testimony, the evidence in the record reflects orders for treatment made by Dr. Chiang throughout Mr. Mertins's hospitalization from June to July, 2012.

¶ 34     Dr. Kochvar, who was an infectious disease physician and Dr. Frishman's partner, saw Mr. Mertins on July 2 and 3, 2012. The defense brought in testimony that Dr. Kochvar saw Mr. Mertins and noted his vital signs, but Dr. Kochvar's notes did not mention ILVT or the need for a cardiologist. Consistent with the testimony at trial, the evidence in the record reflects Dr. Kochvar's name on numerous treatment orders made on June 29, 2012, and on July 2 and 3, 2012.

¶ 35     Dr. Rich was a hematologist whom Dr. Feerst consulted on July 4, 2012, in order to assess Mr. Mertins for possible anemia. Plaintiffs' motion to bar reflects that Dr. Feerst disclosed Dr. Rich as a witness in 2013; plaintiffs and Feerst disclosed Dr. Rich as a witness in 2015; and Dr. Rich was withdrawn as a witness in 2017. At trial, plaintiffs' counsel elicited testimony from Dr. Moran that Dr. Rich left a note of numerous treatment recommendations for Mr. Mertins. This note is contained in the evidence in our record, along with several other orders for treatment made by Dr. Rich. The defense elicited testimony that Dr. Rich examined Mr. Mertins's heart and could have consulted another specialist.

¶ 36    Dr. Crane was a rheumatologist who saw Mr. Mertins on July 6, 2012. Plaintiffs' counsel elicited testimony from Dr. Gavi that Dr. Crane was an intensive care doctor who cared for Mr. Mertins in the ICU. Counsel for Dr. Baker elicited testimony from plaintiffs' witnesses that Dr. Crane approved of Mr. Mertins's discharge on July 6 "[f]rom a rheumatology perspective." Dr. Baker's counsel also elicited testimony regarding a note that Dr. Crane wrote, which said, "[C]hange IV steroids to Prednisone," and "follow up in office with Dr. Furmanov." The evidence in the record contains multiple orders for prednisone made by Dr. Crane on July 6.

¶ 37    Dr. Kerchberger was an infectious disease physician who also approved of Mr. Mertins's discharge "from an infectious disease standpoint" on July 6, 2012. On cross-examination from the defense, plaintiffs' witness, Dr. Crawford testified that Dr. Kerchberger wrote a note on July 6 stating, "Home on Prednisone alone, follow up with Dr. Frishman," but did not recommend a cardiologist consultation. On redirect examination, Dr. Crawford confirmed with plaintiffs' counsel that he would not expect Dr. Kerchberger to recommend a "cardiac workup" because he was an infectious disease physician. The evidence in the record contains a number of notes and orders bearing Dr. Kerchberger's name and dated July 6, 2012.

¶ 38    IV. Trial

¶ 39    A. Opening Statements

¶ 40    During opening statements, Dr. Moran's counsel stated that while Mr. Mertins was at Northwest in June 2012, Dr. Feerst consulted Drs. Frishman and Sergey Furmanov. On June 28, 2012, Mr. Mertins was seen by an "emergency medicine physician," Dr. David Tse, who evaluated Mr. Mertins, ordered an EKG, and concluded that Mr. Mertins was dehydrated and had low blood pressure. That same day, Mr. Mertins was again seen by Dr. Furmanov and Dr. Frishman, as well as a "critical care doctor" named Dr. Lidsky, and Mr. Mertins was moved to the ICU. Dr. Moran's

counsel stated, "None of these physician[s] order[ed] or saw a reason to order a cardiology consult." Counsel also stated that on June 29th, Drs. Feerst, Cruz, Azza Suleiman, Furmanov, and Frishman saw Mr. Mertins, but did not consult a cardiologist because it "wasn't necessary," as Mr. Mertins "didn't have a cardiac issue." Then, Dr. Cruz decided Mr. Mertins could move from the ICU to the "regular floor," where Drs. Feerst, Suleiman, and Frishman saw Mr. Mertins. On July 2, 2012, Drs. Chiang and Kochvar also saw Mr. Mertins, and on July 3, 2012, Drs. Furmanov, Kochvar, Rich, and Feerst saw him. Counsel noted that during these days, Mr. Mertins received a diagnosis of Still's disease, but his symptoms improved.

¶ 41    Counsel for Dr. Moran also emphasized that by the time Dr. Moran was "involved," there had been "23 physician evaluations" by "ten different doctors." Counsel continued, "There was no reason for Dr. Moran to think that the ten doctors who had seen him between June 28th and July 4th, who did 23 separate evaluations, *** somehow missed something." Dr. Moran's counsel asked the jury if it was "reasonable for Dr. Moran to conclude" that Mr. Mertins was stable when he "had been seen by ten different doctors, multiple specialists, and now was doing better."

¶ 42    Counsel for Northwest stated that when Mr. Mertins was admitted into Northwest on June 28, 2012, "he was seen by 14 different doctors over seven different specialties," and "none of them believed that a cardiac consultation was necessary *** because it wasn't."

¶ 43    Throughout the opening statement for Dr. Baker, Dr. Baker's counsel reiterated the point that from June 28, 2012, to July 6, 2012, "there was unanimity *** amongst not 14 physicians *** but 15 physicians" that Mr. Mertins did not need to see a cardiologist. At one point, counsel for Dr. Baker asked the jury, "Were all 15 of those physicians negligent?" The trial court sustained an objection to this question from plaintiffs' counsel and instructed Dr. Baker's counsel to only state

"what the evidence will show." Plaintiffs' counsel did not raise any more objections to similar statements made by Dr. Baker's counsel.

¶ 44     Counsel for Dr. Baker proceeded to state, "the evidence will show that all 15 of these physicians acted as reasonably careful physicians" and concluded Mr. Mertins's condition "had nothing to do with [ILVT]." Baker's counsel then summarized Mr. Mertins's treatment, stating that Dr. Tse saw Mr. Mertins, had an EKG performed, and wrote a note stating, " 'This isn't any different from the prior EKGs.' " Dr. Tse then consulted an infectious disease physician and a rheumatologist "for the real problem that brought Mr. Mertins in to the hospital." Dr. Sita read Mr. Mertins's EKG but did not "raise*** a red flag." Drs. Frishman, Kochvar, Kerchberger, Lidsky, and Crane saw James Mertins, but did not recommend a cardiology consult. Drs. Lidsky and Cruz "spent two days with Mr. Mertins" and had access to "all of the data in his records," but did not suggest a cardiology consult. Dr. Rich assessed the oxygen levels in Mr. Mertins's blood but also did not recommend a cardiologist consult. Additionally, once Dr. Baker was retained, Drs. Kerchberger and Crane approved James Mertins's discharge.

¶ 45     During opening statements, plaintiffs' counsel raised no objections that defendants were referencing improper opinions or observations by undeposed witnesses who were not called as witnesses.

¶ 46     B. Plaintiffs' Motion to Bar

¶ 47     During the cross-examination of plaintiffs' expert, Dr. Schapira, counsel for Dr. Moran elicited testimony regarding Drs. Lidsky, Frishman, Tse, and Sita. On cross-examination from Dr. Baker's counsel, Dr. Schapira stated he "would not disagree" that Mr. Mertins received 31 visits from 14 different physicians. Counsel for Dr. Baker also asked Dr. Schapira whether he knew of Drs. Cruz, Lidsky, Frishman, Kochvar, Kerchberger, and Crane.

¶ 48 The record reflects that after Dr. Schapira's testimony, plaintiffs submitted a motion to bar, which was titled "Plaintiffs' Motion To Instruct the Jury To Disregard References to Observations and Opinions of Undeposed and Undisclosed Treating Doctors." Plaintiffs alleged that during opening statements and the cross-examination of Dr. Schapira, defendants "made reference to the actions, thoughts, rationale, and conclusions" of the undeposed doctors, namely, Drs. Frishman, Lidsky, Cruz, Chiang, Kochvar, Rich, Kerchberger, and Crane. According to plaintiffs, defendants wrongfully "stated and insinuated that [the undeposed] doctors evaluated Mr. Mertins, but none of [them] believed that a cardiology consult was necessary." Because these doctors were not disclosed as witnesses or deposed, plaintiffs asserted that defendants could not submit testimony as to whether they believed a cardiologist was necessary.

¶ 49 Accordingly, plaintiffs requested in their motion that the court instruct the jury to disregard references made to the "opinions, methodology, and conclusions" of the undeposed doctors, and to instruct the jury that the undeposed doctors would not be called at trial. Plaintiffs also requested that the court bar defendants from "further statement, argument, or insinuation as to the observations, considerations, reasoning, rationale, and conclusions of [the undeposed doctors]." Further, plaintiffs requested that the court bar defendants from "asking witnesses if they reviewed depositions which were never taken." On the next day of trial, outside the jury's presence, plaintiffs argued the motion, and the trial court took the motion under advisement.

¶ 50 Plaintiffs then called Dr. Crawford. The defense similarly questioned Dr. Crawford regarding the undeposed doctors. Dr. Crawford denied that he saw any recommendation for a cardiology consult from the "12 or so" consultants who treated Mr. Mertins.

¶ 51 During the cross-examination of Dr. Crawford, outside the jury's presence, the trial court denied plaintiffs' requests to instruct the jury regarding the undeposed doctors, and to bar the

defense from "further statement, argument, or insinuation as to the observations, considerations, reasoning, rationale, and conclusions" of the undeposed doctors. However, the court's order stated that "[u]nless properly disclosed, defendants' experts may not be questioned or opine that their standard of care opinions are supported by the fact that other undeposed consulting doctors did not recommend or call in a cardiologist." The order also barred the defense from asking witnesses if they reviewed depositions that were never taken. When discussing the order with the parties, the court stated defendants could ask plaintiffs' witness if he knew whether the undeposed doctors consulted a cardiologist. The court also clarified that defendants could cross-examine plaintiffs' experts on how their opinions on the standard of care were affected by "the fact that these other doctors *** didn't call in a cardiologist."

¶ 52    After receiving the order, plaintiffs' counsel conducted an adversarial examination of defendant Dr. Moran and elicited testimony regarding Dr. Frishman's June 30 consultation report. Further, plaintiffs' counsel questioned Dr. Moran regarding treatment recommendations that Dr. Rich made to Dr. Feerst.

¶ 53    Next, plaintiffs' counsel called Dr. Benny Gavi. On cross-examination from Dr. Moran's counsel, Dr. Gavi confirmed whether between June 28 and July 3, 2012, Drs. Frishman, Cruz, Lidsky, Chiang, Kochvar, Rich, and Tse saw Mr. Mertins. Counsel for Dr. Baker elicited testimony from Dr. Gavi that Drs. Frishman, Cruz, Lidsky, Chiang, Kochvar, Rich, Tse, and Kerchberger wrote notes regarding Mr. Mertins's condition but did not mention ILVT. Dr. Gavi also confirmed that of the "15 physicians involved with 31 encounters" with Mr. Mertins, only Drs. Moran and Suleiman mentioned ILVT in their notes.

¶ 54    Then, plaintiffs' counsel questioned Dr. Gavi regarding the undeposed doctors. On redirect examination, Dr. Gavi testified that Drs. Frishman, Rich, Cruz, Lidsky, Crane, and Tse were never

asked to consider or "work up" a knowledge of Mr. Mertins's ILVT history. Nonetheless, on re-cross-examination from Northwest's counsel, Dr. Gavi confirmed that "every one of the physicians whose notes we went through *** charted their examination of Mr. Mertins' heart" and "listened for the same regular rate and rhythm."

¶ 55    Plaintiffs also extensively questioned Dr. Feerst regarding the EKG that Drs. Tse and Sita worked on. Under adversarial examination, Dr. Feerst testified that Dr. Tse called him on June 28, 2012, and recommended that Mr. Mertins go to the ICU. Dr. Feerst agreed and asked for three consultants, and Dr. Tse's progress note reflected that Dr. Tse consulted with Drs. Suleiman, Frishman, and Furmanov. Additionally, Dr. Feerst confirmed with plaintiffs' counsel that Drs. Cruz, Lidsky, Chiang, Suleiman, Shanley, Kochvar, and Frishman saw Mr. Mertins. Plaintiffs' counsel then confirmed with Dr. Feerst that more than half of these doctors saw Mr. Mertins in the first three days.

¶ 56    Additionally, plaintiffs' counsel conducted an adversarial examination of Dr. Baker, who testified that of all the consulting physicians, only Dr. Suleiman left a record reflecting a knowledge of Mr. Mertins's history of ILVT.

¶ 57    Defendant Dr. Feerst called Dr. Charles Kinder, who testified that the readout for Mr. Mertins's EKG was not "worrisome," and that Dr. Sita could have corrected the readout if necessary. On cross-examination from plaintiffs' counsel, Dr. Kinder confirmed that he did not recall the identities of Drs. Cruz, Kerchberger, Chiang, Crane, Kochvar, Tse, and Rich. Dr. Feerst also called Dr. Jeffrey Shanes. Plaintiffs' counsel elicited testimony from Dr. Shanes regarding the ability of Drs. Tse and Sita to read the data from the EKG performed on Mr. Mertins.

¶ 58    Outside of the motion to bar that plaintiffs brought following the testimony of Dr. Schapira, plaintiffs' counsel raised no objections that any particular piece of testimony offered by defendants

constituted an improper opinion from an undeposed witness not called as a witness, or that the testimony concerned undisclosed evidence.

¶ 59    C. The Apparent Agency Relationship of Northwest and Dr. Baker

¶ 60    As to the issue of apparent agency between defendants Northwest and Dr. Baker, plaintiff Jacqueline Mertins testified that Dr. Feerst was Mr. Mertins's primary care physician for about a year and a half prior to Mr. Mertins's 2012 admissions at Northwest. The testimony at trial also showed that Dr. Feerst directed Mr. Mertins's care at Northwest up until Dr. Feerst was discharged, and that Dr. Moran covered for Dr. Feerst twice at Dr. Feerst's request.

¶ 61    On direct examination, Dr. Feerst testified that Mr. Mertins requested a new physician. Dr. Feerst called the "the Best Practices answering service" and "asked them to have the doctor on call for Northwest Community Hospital call me." Dr. Feerst then received a call from Dr. Hai, who was "the doctor on call for phone calls from Northwest." He later learned that Dr. Baker, a doctor at Best Practices, assumed Mr. Mertins's care on July 5, 2012. Under adversarial examination from plaintiffs' counsel, Dr. Feerst confirmed that he told Mr. Mertins he "would find [Mr. Mertins] a hospitalist and a hospitalist physician was a physician that only saw patients in the hospital." Dr. Feerst also confirmed that he never personally spoke with Dr. Baker about Mr. Mertins's care. Dr. Baker testified that after his assignment, he acted as Mr. Mertins's attending physician on July 5 and 6, 2012.

¶ 62    The undisputed evidence at trial also showed that Mr. Mertins signed multiple consent forms throughout his hospitalization at Northwest, which stated in relevant part:

"CONSENT FOR TREATMENT ***

I hereby consent to the administration and performance of all tests and treatments by members of the medical staff and personnel at Northwest *** which in the judgment of

the physicians may be considered necessary or advisable for the diagnosis or treatment for the condition for which I am presenting myself. ***

DISCLOSURE STATEMENT ***

My care will be managed by physicians who are not employed by or acting as agents of [Northwest] *** but have privileges at these facilities. My physician may decide to call in consultants who are also not employed by or agents of [Northwest] *** and who practice in other specialties to provide care to me."

¶ 63    Towards the end of the defense's evidence, Northwest brought a motion for directed verdict and argued, in relevant part, that plaintiffs failed to present evidence showing Dr. Baker acted as an apparent agent for Northwest when caring for Mr. Mertins. Northwest's counsel asserted that Mr. Mertins signed a consent form stating he would be treated by physicians who were not agents of Northwest. Moreover, there was no evidence that Mr. Mertins relied on Northwest to provide Dr. Baker. Rather, the evidence showed that "Dr. Feerst provided Dr. Baker, and the patient looked to Dr. Feerst for that."

¶ 64    The trial court initially denied Northwest's motion, stating the evidence "does not so overwhelmingly favor the hospital on the issue of apparent agency that no contrary verdict against the hospital *** could ever stand." While reviewing jury instructions at the close of evidence, however, the trial court revisited the motion outside the jury's presence. The court asked plaintiffs' counsel to identify evidence showing Mr. Mertins relied on Northwest to provide care through Dr. Baker. Plaintiffs' counsel argued that Mr. Mertins signed consent forms stating he would be treated by "physicians that were members of the Northwest Community Hospital medical staff," and that Dr. Feerst testified he called "a group of hospitalists that were on call for Northwest." The court observed that while the consent form may support the "holding out" element, of apparent agency,

it did not show Mr. Mertins relied on such "holding out." The court also noted there was no evidence that Mr. Mertins knew about Dr. Feerst's phone conversations with Best Practices. Accordingly, the circuit court granted Northwest's motion for directed verdict as to Dr. Baker, finding there was no evidence to support a finding that an apparent agency relationship existed between Northwest and Dr. Baker.

¶ 65    D. Closing Arguments regarding the Undeposed Doctors Not Called as Witnesses

¶ 66    During closing arguments, counsel for Dr. Moran stated in relevant part that Mr. Mertins "was seen by 17 different doctors," none of whom suggested consulting a cardiologist. Counsel described Mr. Mertins's hospital admissions, stating that "he had 31 heart examinations by 14 different doctors," and there was no evidence of "an abnormal heart rhythm" or ILVT. From June 28 to July 3, 2012, 10 different doctors saw Mr. Mertins but did not recommend a cardiologist. In relevant part, counsel recounted that Dr. Tse ordered Mr. Mertins's EKG, Dr. Frishman saw Mr. Mertins three times, Drs. Cruz and Kochvar each saw him twice, and Drs. Lidsky and Rich each saw him once. Then, after Dr. Moran last saw Mr. Mertins, five more doctors saw Mr. Mertins, and none of them "felt that a cardiologist was needed." Counsel asked the jury, "Did all of these doctors miss this issue," or "is the other conclusion reasonable; that this patient did not present *** signs or symptoms of a cardiac problem while he was in the hospital?"

¶ 67    Counsel for Dr. Baker asked the jury whether Dr. Baker was "negligent for failing to do something that no other physician involved in this care and treatment *** did." Dr. Baker's counsel also emphasized that Drs. Tse, Lidsky, and Cruz did not seek to consult a cardiologist. Then, counsel argued that "when 15 physicians see a patient over a nine-day hospitalization, and none of them suggest[s] *** that it might be necessary to get a cardiology consultation, you can take that to be evidence of standard of care; evidence of what is and is not negligence." Counsel for Dr.

Baker additionally observed that "three of those 15" were in the courtroom, and that "circumstantial evidence of the behavior of the other 12 *** shouldn't send you the message that the other 12 did the wrong thing." Rather, counsel asserted it "should send you the message that these three did the right thing."

¶ 68    In rebuttal, plaintiffs' counsel stated that defendants' attorneys "talk[ed] about all these consultants," but "[n]ot one of those consultants came into this courtroom to testify," even though "[a]ll of them were involved" and "on the staff of the hospital." Plaintiffs' counsel additionally mentioned the EKG and stated that Dr. Sita reported a "prolonged QT interval" but did not edit the report because "[i]t was correct."

¶ 69    E. Closing Argument of Counsel for Dr. Feerst

¶ 70    Also during closing arguments, counsel for Dr. Feerst stated, in relevant part, as follows:

"So, ladies and gentlemen, I submit to you that the plaintiff has woefully failed to meet their burden of proof in this case by the evidence and testimony they've called in this case. I invite you to consider all the testimony, all of the witnesses that are called, and I think when you do that—and this is not a judgemental [*sic*]—nobody is a bad person because they don't prove their case, but if they don't prove their case, each of these defendants are entitled to the protection of that burden of proof because any of us can find ourselves as a defendant in a lawsuit."

Plaintiffs' counsel stated, "Objection, your Honor." The court responded, "Overruled. Go ahead. Ladies and gentlemen, this case is not about anybody. It's about the defendants in this case."

¶ 71    Outside the jury's presence, plaintiffs moved for a mistrial and argued that the statement made by Dr. Feerst's counsel in closing argument violated the "golden rule." Dr. Feerst's counsel asserted that he did not violate the "golden rule" because he "didn't ask the jury to put themselves

in [defendants'] shoes specifically." Rather, counsel for Dr. Feerst "just referenced what everybody knows, that a defendant, when sued, is entitled to the protections of the burden of proof." The trial court stated that it had "instructed the jury *** that the rights of any other person are not at issue in this case, only the defendants are at issue here in the case." The court therefore found that its admonition had "neutralized any type of harmful effect from that comment," and denied plaintiffs' motion for mistrial.

¶ 72    V. Jury Verdict and Posttrial Proceedings

¶ 73    The jury returned a verdict in favor of all defendants and against plaintiffs. Plaintiffs brought a post-trial motion, arguing in relevant part that defendants were wrongfully permitted to present evidence regarding the observations and opinions of 11 consulting physicians who were neither deposed nor disclosed as witnesses, and that defendants wrongfully referenced the evidence in opening statements and in closing arguments. The motion also stated that the trial court erred in entering a directed verdict as to the issue of Dr. Baker's apparent agency, and that defense counsel violated the "golden rule" in closing argument by telling the jury they could find themselves in a similar lawsuit.

¶ 74    At a hearing on the motion, the parties disputed whether plaintiffs had properly preserved the issue regarding the undeposed doctors' "opinions." Plaintiffs asserted they preserved the issue by moving to bar defendants from presenting such evidence, thus giving the trial court "ample opportunity *** to be aware of the situation." Plaintiffs' counsel also asserted they did not waive the issue by presenting testimony regarding the undeposed doctors. Rather, plaintiffs claimed they were "ambushed during opening statement" with the theory that the doctors had "some sort of unanimity of opinion," and thus plaintiffs had to "on the fly *** ameliorate that problem."

¶ 75    Defendants responded that they only presented "medical fact[s]" that 15 doctors saw Mr. Mertins, but did not consult a cardiologist. According to the defense, the jury could reasonably infer from these facts that Mr. Mertins did not need to see a cardiologist. As to the issue of waiver, defendants argued that while plaintiffs had brought a motion challenging evidence of the undeposed doctors' observations, the issue was never raised in a contemporaneous objection at trial.

¶ 76    The trial court entered an order finding that defendants' opening statement remarks regarding the undeposed doctors were "neither inflammatory nor prejudicial to plaintiff's right to a fair trial"; that defendants' questions regarding the undeposed doctors in cross-examination were "fair and relevant"; and that defendants' remarks in closing argument regarding the undeposed doctors constituted "reasonable argument based on fair inferences." Additionally, the trial court rejected plaintiffs' "golden rule" argument, finding that the statement in question was made to "reinforce*** the protections of the burden of proof" and "fell within the bounds of proper argument." Nonetheless, the court found it cured any potential prejudice by telling the jury that the case was not about "anybody." As to the apparent agency relationship of Northwest and Dr. Baker, the court found there was no evidence showing that Dr. Baker was held out as an agent for Northwest, or that Mr. Mertins relied on Northwest to provide care through Dr. Baker. This appeal followed.

¶ 77    ANALYSIS

¶ 78    I. Undeposed Doctors Not Called as Witnesses

¶ 79    On appeal, plaintiffs first assert that the trial court erred by allowing defendants' attorneys to present arguments during opening statements and closing arguments regarding the opinions and observations of the undeposed doctors not called as witnesses, namely, Drs. Cruz, Frishman,

Chiang, Kochvar, Rich, Tse, Sita, Kerchberger, Lidsky, and Crane. In response, defendants Feerst, Moran, Baker, and Best Practices argue that plaintiffs failed to preserve this issue on appeal. Moreover, defendants assert that the two-issue rule precludes us from reversing the trial court's judgment, since the remarks regarding the undeposed doctors only concerned whether there was a breach of the standard of care, and the jury also could have found plaintiffs did not establish proximate cause. Regardless of plaintiffs' waiver and the two-issue rule, however, defendants claim that the remarks at issue only concerned facts, from which the jury was allowed to draw reasonable inferences. We first examine whether the issue before us has been preserved for appeal.

¶ 80    Generally, this court cannot review challenges to a trial court's evidentiary rulings unless they have been properly preserved. *Guski v. Raja*, 409 Ill. App. 3d 686, 695 (2011). To preserve an issue for appeal, a party must raise the issue in a contemporaneous objection and in a post-trial motion. *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 892 (1992). Denial of a complaining party's pretrial motion *in limine* to exclude evidence will not sufficiently preserve an issue on appeal, as such a ruling is interlocutory and remains subject to reconsideration throughout trial. *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 54. Rather, the complaining party must still contemporaneously object at trial when the evidence is introduced so that the trial court may revisit its earlier ruling. *Id.*

¶ 81    Once the court has ruled on an objection, however, a party need not repeat the objection each time similar matters are presented. *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 165 (2006). Rather, the party "is entitled to assume that the trial judge will continue to make the same ruling and that he need not repeat the objection." *Id.*; see also *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 28 ("A party who has objected *** is not required to repeat the same objection each time the evidence in question is offered when the attitude of the trial court as to the objection is

clear.") and *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d 1031, 1040 (1988) (noting that while the appellant failed to preserve the issue on appeal, appellant's counsel would not have needed "to object in front of the jury each time reference was made" to the evidence at issue, but "could have objected once, outside the presence of the jury, and asked for a continuing objection").

¶ 82    Here, plaintiffs did not present a pretrial motion *in limine* regarding the issue on appeal but rather, during trial and after Dr. Schapira's cross-examination, presented a motion to bar evidence regarding the undeposed doctors. See *McMath v. Katholi*, 304 Ill. App. 3d 369, 376 (1999), *rev'd on other grounds*, 191 Ill. 2d 251 (2000) (stating that a motion to bar testimony filed during trial is not interlocutory for purposes of preserving an issue, as it "does not constitute a motion *in limine*, which is by definition a *pretrial* motion."). Defendants assert that although plaintiffs raised the issue in the motion to bar, they forfeited the issue by failing to raise more objections, and by presenting evidence and remarks in closing arguments regarding the undeposed doctors. We disagree with defendants.

¶ 83    During opening statements, counsel for Dr. Moran described the hospital admissions of Mr. Mertins, including the treatment given by Drs. Frishman, Tse, Lidsky, Cruz, Chiang, Kochvar, and Rich. Dr. Moran's counsel emphasized that "[n]one of these physician[s] order[ed] or saw a reason to order a cardiology consult." Northwest's counsel also noted that Mr. Mertins "was seen by 14 different doctors over seven different specialties," none of whom believed a cardiac consultation was necessary. Similarly, Dr. Baker's counsel described the care provided by Drs. Tse, Sita, Frishman, Kochvar, Kerchberger, Lidsky, Crane, and Rich.  Counsel for Dr. Baker argued that there was "unanimity *** amongst not 14 physicians *** but 15 physicians" that Mr. Mertins did not need to see a cardiologist, and that the evidence would show all 15 physicians

"reached the same conclusion." Based on these facts regarding Mr. Mertins's treatment, counsel for Drs. Moran and Baker inferred that their clients were not negligent for not consulting a cardiologist, when several other doctors saw Mr. Mertins and did not consult a cardiologist.

¶ 84    During trial and after their expert witness was cross-examined extensively regarding the undeposed doctors, plaintiffs brought a motion to bar similar evidence, and raised the issue once again in a posttrial motion. We find plaintiffs preserved this issue as to the opening statements when they brought a contemporaneous objection at trial in the form of a motion to bar, and raised the issue again in a posttrial motion. *Kim*, 240 Ill. App. 3d at 892.

¶ 85    Similarly, we find plaintiffs preserved their challenge to the remarks made in closing arguments regarding the undeposed doctors. During trial, the trial court partially granted plaintiffs relief. However, the court denied plaintiffs' request to "[i]nstruct the jury to disregard references defense attorneys made" to the undeposed doctors during opening statements. The court also denied plaintiffs' request to bar defendants "from further statement, argument, or insinuation as to the observations, considerations, reasoning, rationale, and conclusions" of the undeposed doctors.

¶ 86    Then, during closing arguments, counsel for Dr. Moran argued that "17 different doctors" saw Mr. Mertins, and none of them suggested a cardiologist. Dr. Moran's counsel recounted the treatment provided by Drs. Tse, Frishman, Cruz, Kochvar, Lidsky, and Rich. After outlining the number of doctors who saw Mr. Mertins, Dr. Moran's counsel asked the jury to draw an inference from these facts, questioning, "Did all of these doctors miss this issue," or "is the other conclusion reasonable; that this patient did not present *** signs or symptoms of a cardiac problem while he was in the hospital?" Based on these facts, counsel for Dr. Baker stated that "when 15 physicians see a patient over a nine-day hospitalization, and none of them suggest *** it might be necessary to get a cardiology consultation, you can take that to be evidence of standard of care." These

statements largely mirrored the remarks made in opening statements, which the trial court had ruled were proper. Thus, based on the court's partial denial of plaintiffs' motion to bar, the trial court's stance on plaintiffs' objection was clear, and it was not necessary for plaintiffs to continuously assert their objection during closing arguments to preserve this issue. *Spyrka*, 366 Ill. App. 3d at 165.

¶ 87    Having found this issue was properly preserved, we now consider whether defendants improperly remarked, in opening statement and closing argument, on the opinions and observations of physicians who were neither deposed nor called as witnesses. "Considerable latitude must be afforded counsel in opening statement or closing argument." *Augenstein v. Pulley*, 191 Ill. App. 3d 664, 670 (1989). Opening statements are intended "to apprise the jury of what the parties intend to prove at trial," and counsel may not comment on matters he or she will not or cannot prove. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 29. Nonetheless, "opening statement may include a discussion of expected evidence and reasonable inferences to be drawn therefrom." *Id.* Similarly, counsel during closing argument "may comment and argue on the evidence and any inference that may be fairly drawn from that evidence." *Clarke v. Medley Moving and Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008).

¶ 88    Improper comments made during opening statement only constitute reversible error when they "are made deliberately via misconduct and result in substantial prejudice to the opposing party such that the result of the trial would have been different had the comments not been made." *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 29. Similarly, improper comments by counsel during closing argument warrant reversal "only where the comments are so prejudicial as to deprive the other party of the right to a fair trial." *Clarke*, 381 Ill. App. 3d at 95. The trial court has discretion

in determining the scope of a closing argument. *Weisman v. Schiller, Ducanto and Fleck, Ltd.*, 368 Ill. App. 3d 41, 62 (2006).

¶ 89    Initially, we note that plaintiffs cite no legal authority stating that the evidence supporting the opening and closing remarks at issue was inadmissible. In their reply brief, plaintiffs also do not address the case law cited by defendants Dr. Baker and Best Practices stating that an expert may testify regarding medical records from other medical personnel when testifying as to an opinion. See *Piano v. Davison*, 157 Ill. App. 3d 649, 672 (1987) ("It is not error to permit an expert to testify regarding reports or medical tests performed by other doctors, and which he examined in reaching his own opinion."); see also *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 898 (1990) (finding "it was proper for defendants to cross-examine [the plaintiffs'] experts on the data contained within the medical records, even though the records themselves were inadmissible").

¶ 90    Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007) provides that "[u]pon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide," among other things, information regarding any independent or controlled expert witnesses and the opinions the disclosing party expects to elicit. However, " 'none of Rule 213's disclosure requirements applies to cross-examining an opposing party's opinion witness.' " *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147, 157 (2010) (quoting *Maffett v. Bliss*, 329 Ill. App. 3d 562, 577 (2002).

¶ 91    The evidence regarding the undeposed physicians was introduced either by defendants in cross-examination of plaintiffs' witnesses, or by plaintiffs themselves. Yet the disclosure requirements of Rule 213 do not apply when cross-examining an opposing party's opinion witnesses. *Id.* Plaintiffs also would not be able to claim that the evidence and testimony regarding

the undeposed doctors was improper, to the extent that it was introduced by plaintiffs themselves. See *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374 (1990) (stating "where a party himself introduces or elicits certain evidence, he cannot later complain"). Thus, plaintiffs have not shown that the defense remarked on any testimony not properly entered into evidence. Defendants had wide latitude in describing what the evidence would show in opening statements (*Augenstein*, 191 Ill. App. 3d at 670; *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 29), and in commenting and arguing on the evidence properly admitted at trial. *Clarke*, 381 Ill. App. 3d at 95.

¶ 92 Regardless of whether the remarks in opening statement and closing argument were proper, however, we find that they do not constitute reversible error, as plaintiffs cannot show they were surprised or prejudiced. Specifically, the record does not show that plaintiffs were unaware of the undeposed doctors' existence, or that plaintiffs had not seen any of the evidence bearing the undeposed doctors' names. Plaintiffs also do not claim on appeal that the evidence regarding the undeposed doctors was not disclosed during discovery, or that testimony regarding that evidence was never raised in pretrial depositions. Because Dr. Baker assumed care for Mr. Mertins in the final two days of his approximately weeklong hospitalization, plaintiffs could have foreseen that Dr. Baker, in particular, would have focused on Mr. Mertins's prior care and diagnoses as evidence of Dr. Baker's lack of negligence.

¶ 93 The record suggests that even prior to trial, plaintiffs were fully aware of the undeposed doctors at issue on appeal. As we have described, plaintiffs themselves admitted a significant portion of the testimony concerning the undeposed doctors during trial, and they sought to admit two of the undeposed doctors as rebuttal witnesses over the defense's objection. Plaintiffs' motion to bar even suggests that plaintiffs had originally disclosed two of the undeposed doctors, Drs. Frishman and Rich, as witnesses but withdrew them prior to trial. Additionally, the medical records

entered into evidence at trial and contained in the appellate record extensively reflect the names of the undeposed doctors. Had plaintiffs truly been surprised by this evidence as it was disclosed, they could have moved for defendants to disclose more information on the undeposed doctors. See Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014) ("[A] party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking disclosure or of any other party, including *** the identity and location of persons having knowledge of relevant facts."); see also Ill. S. Ct. R. 219(c) (eff. July 1, 2002) (authorizing the trial court to grant a number of remedies where a party violates the rules of discovery). There is also nothing in the record suggesting plaintiffs themselves could not have deposed and called as witnesses any of the doctors prior to trial. Plaintiffs had access to the same information as defendants and were able to respond to that information at trial. Therefore, any remarks on this information in opening statement and closing argument could not constitute reversible error. *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 29; *Clarke*, 381 Ill. App. 3d at 95.

¶ 94 We additionally note that we would not be able to reverse the decision of the circuit court under the "two issue rule." A general verdict "creates a presumption that the jury found in favor of [a defendant] on every defense raised [citation], as well as a presumption that all issues of fact upon which proof was offered were found in favor of the prevailing party [citation]." (Internal quotation marks omitted.) *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 51. Under the "two issue rule," "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the [moving party], having failed to request special interrogatories, cannot complain." (Internal quotation marks omitted.) *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101

(2010). While plaintiffs assert that the "two issue rule" only applies to jury instructions, we find no legal authority suggesting this rule should be so limited, as this court has applied the rule in other contexts. See *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369, ¶ 43-45 (applying the "two issue rule" where defendants argued the trial court made multiple "evidentiary errors" concerning three of the defendants' five alleged negligent acts, but the jury's general verdict for the plaintiff did not specify the negligent act on which the verdict was based).

¶ 95     At trial, plaintiffs asserted the theory that defendants failed to recognize and communicate Mr. Mertins's ILVT, failed to consult a cardiologist, and improperly adjusted his verapamil doses, causing Mr. Mertins's cardiac arrest and subsequent brain damage. Yet plaintiffs presented inconsistent testimony regarding whether Mr. Mertins's ILVT was benign, and they did not present a clear, consistent theory as to what specifically caused the cardiac arrest. On the other hand, defendants presented consistent expert testimony that ILVT is benign, and that a cardiologist would not have done anything differently, since Mr. Mertins's ILVT was inactive and his bradycardia was asymptomatic.

¶ 96     The jury returned a general verdict for all defendants and against plaintiffs, and plaintiffs did not request a special interrogatory. Because defendants presented theories questioning both whether there was a breach of the standard of care and whether there was proximate cause, we must presume that the jury found in favor of defendants on both these issues. *Obermeier*, 2019 IL App (1st) 170553, ¶ 51. However, the defense's remarks regarding the undeposed doctors were only made to support an inference that defendants did not breach the standard of care by not mentioning ILVT or consulting a cardiologist, when so many other doctors acted similarly. These remarks did not concern the issue of proximate cause, and plaintiffs have not raised any issues on appeal that would affect the jury's verdict as to proximate cause. Therefore, even if the remarks

regarding the undeposed doctors constituted error, the two-issue rule would preclude us from reversing the trial court's judgment. We must uphold the jury's verdict, as the evidence at trial would have allowed the jury to conclude that plaintiffs failed to establish proximate cause. *Lazenby*, 236 Ill. 2d at 101.

¶ 97    Accordingly, we will not reverse the trial court's judgment based on its decision to allow comments regarding the undeposed doctors in opening statements and closing arguments.

¶ 98    II. "Golden Rule" in Closing Argument

¶ 99    Second, plaintiffs argue that the trial court erred in denying their motion for mistrial as to the argument that Dr. Feerst's counsel violated the "golden rule" by telling the jury in closing that "any of us can find ourselves as a defendant in a lawsuit." Defendants Dr. Moran, Dr. Feerst, Dr. Baker, and Best Practices respond that the statement at issue was not intended to appeal to the jury's passions or prejudices, but rather was made to emphasize the protections provided by plaintiffs' burden of proof. Regardless of the comment's propriety, however, defendants also assert that the trial court cured any prejudice by clarifying that the case was about "defendants," not "anybody."

¶ 100   As we have stated, attorneys are given wide latitude in closing argument to comment and argue based on the evidence at trial, and to draw reasonable inferences from that evidence. *Id.* However, "[i]t is improper to ask jury members to place themselves in the position of a party litigant when such a request is calculated to arouse their passions and prejudices." *Offutt v. Pennoyer Merchants Transfer Co.*, 36 Ill. App. 3d 194, 204 (1976). When determining whether the use of this so-called "golden rule" argument "elicit[s] passion, prejudice, or sympathy from the jury," we must view the improper comments not in isolation, but within the context of the closing argument as a whole. *Sikora v. Parikh*, 2018 IL App (1st) 172473, ¶ 60. The determination of

whether comments made during closing argument had a prejudicial effect is within the trial court's discretion, and we will not reverse that determination absent a clear abuse of discretion. *Clarke*, 381 Ill. App. 3d at 95; see also *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 873 (2004). "In determining whether there has been an abuse of discretion, we may not substitute our judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely." *Morrisroe v. Pantano*, 2016 IL App (1st) 143605, ¶ 48.

¶ 101   During closing arguments, counsel for Dr. Feerst told the jury that plaintiffs had "woefully failed to meet their burden of proof," but "nobody is a bad person because they don't prove their case." Then, counsel emphasized that "if [plaintiffs] don't prove their case, each of these defendants are entitled to the protection of that burden of proof because any of us can find ourselves as a defendant in a lawsuit." Viewing the entire closing argument, we cannot conclude that Dr. Feerst's counsel was appealing to the "passions and prejudices" of the jury. *Offutt*, 36 Ill. App. 3d at 204. Rather, counsel was emphasizing the importance of strictly following the burden of proof when determining his client's liability. See *Sikora*, 2018 IL App (1st) 172473, ¶ 63 (finding the defendant's counsel did not intend to appeal to the jury's "sympathy" or "passions" by asking the jury to "[s]tand in [the defendant] shoes on that morning," where counsel "merely intended to *** frame the critical issues of the trial" in terms of what the defendant knew at the relevant time).

¶ 102 Even if counsel's statement was improper, however, the circuit court soon after admonished the jury that the case was about "defendants," not "anybody." See *Id.* ¶ 64 (finding the trial court mitigated any prejudice from an alleged "golden rule" argument by telling the jury to disregard the comment); see also *Blockmon v. McClellan*, 2019 IL App (1st) 180420, ¶¶ 50-54 (finding that counsel's remarks in closing argument did not result in any prejudice, where the trial

court told the jury to disregard them). In ruling on plaintiffs' motion for mistrial based on this issue, the court stated its admonishment to the jury had "neutralized any type of harmful effect from that comment." Because counsel's remark was not intended to appeal to the passions and prejudices of the jury, and because the trial court quickly admonished the jury regarding the comment, the trial court did not abuse its discretion in determining that no prejudice resulted from the alleged "golden rule" comment made by Dr. Feerst's counsel. *Clarke*, 381 Ill. App. 3d at 95.

¶ 103   Accordingly, we will not reverse the trial court's judgment based on defense counsel's alleged use of the "golden rule" argument.

¶ 104   III. Apparent Agency of Dr. Baker

¶ 105   Plaintiffs also argue on appeal that the trial court erred by granting Northwest's motion for directed verdict, based on a finding that there was no evidence supporting an apparent agency relationship between Northwest and Dr. Baker. In response, Northwest asserts that plaintiffs failed to prove the reliance and "holding out" elements of their apparent agency claim.

¶ 106   The doctrine of apparent agency is based upon "[t]he idea *** that if a principal creates the appearance that someone is his agent, he should not then be permitted to deny the agency if an innocent third party reasonably relies on the apparent agency and is harmed as a result." (Internal quotation marks omitted.) *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 187 (2006). Further, the Illinois supreme court has recognized that the relationship between a patient and health-care providers "presents a matrix of unique interactions that finds no ready parallel to other relationships." *York*, 222 Ill. 2d at 192. Thus, our supreme court in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993) (internal quotation marks omitted), set forth the following elements for establishing apparent agency in the context of hospital care:

"For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence."

¶ 107    When determining apparent agency in a medical malpractice action, "the critical distinction is whether the patient relied upon the *hospital* for the provision of care or, rather, upon the services of a particular physician." (Emphasis in original.) *Id.* at 193 (citing *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993). "[U]nless the patient knows or should have known that the physician providing treatment is an independent contractor, vicarious liability can attach to a hospital for the medical malpractice of its physicians under the apparent authority doctrine." *Yarbrough v. Northwestern Memorial Hospital*, 2017 IL 121367, ¶ 39.

¶ 108    "The 'holding out' element does not require an express representation by the hospital that the person alleged to be negligent is an employee" *Gilbert*, 156 Ill. 2d at 525. "Rather, this element is satisfied if the hospital holds itself out as a provider of care without informing the patient that the care is provided by independent contractors." *York*, 222 Ill. 2d at 185. The hospital prevails on this element when "the patient is in some manner put on notice of the independent status of the professionals with whom he might be expected to come into contact." (Internal quotation marks omitted.) *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶ 58. While hospital consent forms with an "independent contractor disclaimer" are an important factor to consider for purposes of the "holding out" element of apparent authority, they are not necessarily dispositive.

*Wallace v. Alexian Bros. Medical Center*, 389 Ill. App. 3d 1081, 1087 (2009). That said, where the consent form contains multiple, seemingly contradictory, and ambiguous sections regarding the employment status of a hospital's individual physicians, a hospital will not necessarily prevail as to the "holding out" element. See *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 837 (2009) (finding a consent form was ambiguous and did not adequately inform the plaintiff of her doctor's independent contractor status, where the independent contractor disclaimer provision was "immediately preced[ed]" by a paragraph stating " '*hospital employees* will attend to my medical needs as may be necessary' " (emphasis in original)); but see *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶¶ 28-30 (finding a consent form was clear and unambiguous as to a treating doctor's independent status, where the disclaimer section was located directly above the signature line, and the form stated in bold, capitalized letters, " 'PHYSICIANS ARE NOT EMPLOYEES OF THE MEDICAL CENTER,' " and, " 'NONE OF THE PHYSICIANS WHO ATTEND ME AT THE HOSPITAL ARE AGENTS OR EMPLOYEES OF THE HOSPITAL' ").

¶ 109   The reliance element of an apparent agency claim "is satisfied if the plaintiff reasonably relies upon a hospital to provide medical care, rather than upon a specific physician." *York*, 222 Ill. 2d at 194. Once a patient is admitted to a hospital, the patient seeks care from the hospital itself, except for any treatment provided by physicians selected by the patient. *Id.* Where the patient does not select a specific physician to provide treatment, "it follows that the patient relies upon the hospital to provide complete care *** through the hospital's staff." *Id.*

¶ 110   We will uphold a directed verdict where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Sullivan v. Edward*

*Hospital*, 209 Ill. 2d 100, 123 (2004). "A directed verdict in favor of a defendant is appropriate when the plaintiff has not established a *prima facie* case." *Id.* In order to survive a motion for directed verdict, the plaintiff "must present at least some evidence on every essential element of the cause of action." *Id.* "In ruling on a motion for a [directed verdict], a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." (Internal quotation marks omitted.) *Private Bank v. Silver Cross Hospital and Medical Centers*, 2017 IL App (1st) 161863, ¶ 40. We review *de novo* the trial court's granting of a directed verdict. *Id.*

¶ 111 We find that the trial court did not err in entering a directed verdict as to the apparent agency issue between Northwest and Dr. Baker, as there was no evidence at trial showing that Mr. Mertins relied upon any "holding out" by Northwest.

¶ 112 At trial, the undisputed evidence showed that Dr. Feerst had been Mr. Mertins's primary care physician for a year and a half before Mr. Mertins's admission to Northwest in 2012. Further, Dr. Feerst directed Mr. Mertins's care at Northwest, while Dr. Moran covered for Dr. Feerst twice during his 2012 admissions. When Mr. Mertins discharged Dr. Feerst as his physician, he requested that Dr. Feerst select a new treating physician. Dr. Feerst told Mr. Mertins he would "find [Mr. Mertins] a hospitalist and a hospitalist physician was a physician that only saw patients in the hospital." Then, Dr. Feerst called Best Practices and asked to "have the doctor on call for Northwest *** call me." Dr. Hai called, and Dr. Feerst later learned that Dr. Baker was assigned to treat Mr. Mertins. This undisputed evidence showed that Mr. Mertins sought a replacement physician through Dr. Feerst, and not Northwest, and plaintiffs presented no evidence to the contrary.

¶ 113    We also note that the evidence at trial showed that Mr. Mertins signed multiple consent forms while at Northwest, which stated that Mr. Mertins's "care will be managed by physicians who are not employed by or acting as agents of [Northwest] *** but have privileges at these facilities." However, the consent form also provided, "I hereby consent to the administration and performance of all tests and treatments *by members of the medical staff and personnel at Northwest*." (Emphasis added.) While these seemingly conflicting provisions may have supported plaintiffs' case as to the "holding out" element of an apparent agency claim (see *Spiegelman*, 392 Ill. App. 3d at 837), there was no evidence that Mr. Mertins relied on this ambiguous form as an indication that Dr. Baker was Northwest's agent. To the contrary, plaintiffs assert on appeal that "Dr. Baker did not have Mr. Mertins sign a new consent form."

¶ 114    On appeal, plaintiffs do not raise any evidence presented at trial that could support a finding that Mr. Mertins relied upon Northwest to provide care through Dr. Baker. Rather, they only make the following factual assertions: (1) Mr. Mertins was admitted into Northwest and remained there after discharging Dr. Feerst; (2) Dr. Feerst practiced alone, suggesting that "Mr. Mertins knew that Dr. Baker was unaffiliated with Dr. Baker"; (3) "Dr. Baker did not have Mr. Mertins sign a new consent form"; (4) nurses checked Mr. Mertins's vital signs and provided Mr. Mertins with the medications that Dr. Baker ordered; (5) Mr. Mertins "remained compliant" with the care provided to him; (6) evidence "indicates" that Dr. Baker told Mr. Mertins to follow up with consulting doctors; (7) Dr. Baker had the authority to discharge Mr. Mertins from Northwest; and (8) Mr. Mertins left the hospital after Dr. Baker released him. Based on these last two facts, plaintiffs claim, "If Mr. Mertins did not rely on Dr. Baker's apparent authority to release Mr. Mertins from [Northwest], Mr. Mertins would never have left [Northwest]." However, plaintiffs cite no evidence

in the record showing that Mr. Mertins believed Dr. Baker's authority to release him was derived from Northwest.

¶ 115   Plaintiffs' other factual assertions likewise do not support a finding that Mr. Mertins relied on Northwest to provide Dr. Baker as a physician, and plaintiffs also do not cite any specific portion of the record supporting these assertions. Rather, plaintiffs primarily cite a large range of pages in the supplemental record and do not reference any specific portion therein. These pages primarily reflect handwritten doctors' notes and schedules for medication, and there is no indication from these documents that Mr. Mertins saw them or used them as a basis to believe that Dr. Baker was an agent for Northwest.

¶ 116   Ultimately, as our supreme court has observed, "[u]pon admission to a hospital, a patient seeks care from the hospital itself, except for that portion of medical treatment provided by physicians specifically selected by the patient." *York*, 222 Ill. 2d at 194. The undisputed evidence showed that Dr. Feerst was Mr. Mertins's primary care physician for a year and a half prior to Mr. Mertins's 2012 hospitalization. Then, Mr. Mertins specifically asked Dr. Feerst to find a new physician for him, which Dr. Feerst did in contacting Best Practices, who provided Dr. Baker as a physician. We find the evidence overwhelmingly supported a finding that Dr. Baker did not act as an apparent agent for Northwest, and plaintiffs failed to establish a *prima facie* case as to the reliance element of their apparent agency claim.

¶ 117   We therefore affirm the trial court's judgment in entered directed verdict as to the issue of apparent agency between Northwest and Dr. Baker.

¶ 118   CONCLUSION

¶ 119   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 120   Affirmed.